997 So.2d 647 (2008)
Robert T. WEINMANN and Cindy Howson wife of Robert T. Weinmann
v.
Troy DUHON, Michael Seago, David R.H. Williams and Allen Krake.
No. 08-CA-186.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 2008.
*649 Brian C. Bossier, Erin H. Boyd, Blue Williams, L.L.P., Metairie, Louisiana, for Plaintiff/Appellee and 2nd Appellant.
T. Carey Wicker, III, New Orleans, William W. Hall, Metairie, Louisiana, Edwin A. Stoutz, Jr., Attorney at Law, New Orleans, Louisiana, Franz L. Zibilich, Attorney at Law, Metairie, Louisiana, for Defendants/Appellants.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS, and MADELINE JASMINE, Pro Tempore.
MARION F. EDWARDS, Judge.
The appeal before this Court is part of extended litigation involving the dissolution of Regency Motors of Metairie, L.L.C. ("Regency"). Regency was organized by Robert Weinmann ("Weinmann") (40 percent), Michael Seago ("Seago") (35 percent), and Troy Duhon ("Duhon") (25 percent) in June of 1997. In February of 1998, two new members, David Williams ("Williams") and Allen Krake ("Krake") were added. They purchased 5 percent and 10 percent of the company, respectively, from Seago. Weinmann transferred 10 percent of his share to his wife, Cindy Weinmann.
There was disagreement from the beginning about how the company should be managed. The Seago Interests (Seago, Williams, Duhon, and Krake), with 60 percent of the company opposed the Weinmanns and expelled them from the company. As a result, Robert and Cindy Weinmann filed an action for dissolution of Regency in 1999. After a hearing on that matter, the trial court made several rulings, including a finding that the Operating Agreement was valid as to all the members except Duhon who had not signed it, Cindy Weinmann was a valid member of the company pursuant to the Operating Agreement, and the expulsion of Robert and Cindy Weinmann from the company was invalid. The trial court also denied the Weinmanns' request to dissolve the LLC. That judgment was appealed to this Court.
On appeal, we vacated the trial court's judgment and remanded the matter for further proceedings.[1] In that opinion we found that the trial court erred legally in setting aside various provisions of the agreement between the parties and in not ordering its dissolution. We found the Weinmanns were entitled to dissolution in accordance with Louisiana's Limited Liability Company Law and that the trial judge erred in denying that request.[2]
Subsequently, on January 16, 2003, the parties entered into a written Settlement Agreement. Handwritten changes were made to the original typed document, and it is signed by all parties except Duhon and Krake. Seago signed for those two *650 parties with the notation, "Mike Seago as per proxy."
The settlement agreement is clearly meant to settle all the matters litigated among the parties as it contains the following language: "the parties do hereby wish to settle all litigation currently pending against each other under the terms set forth below[.]" The settlement agreement also appears to be an attempt to set up a sale of Regency to the Weinmanns for 60 percent of the appraised value of the company. The new company formed by the Weinmanns eventually became Veterans Ford. The agreement further states that the "Operating Agreement is in full force and effect as to all members," and that "Regency will make Weinmanns whole," which includes the following provision: "Any and all payments to or benefits received by the Seago Interests (including salaries or consulting fees) will be considered distributions. A distribution will be made to the Weinmanns in an amount to bring them up to their proportionate share of total distributions."
Additionally, the settlement agreement is subject to certain requirements, including the following: "5. All interests and assets purchased would be free of liens and encumbrances except as noted on the records of the LLC and specifically assumed by the Weinmanns. 6. Approval of Ford."
On February 21, 2003, the parties executed a second document, which is a written Agreement to Purchase. This document is a more formal document than the Settlement Agreement and sets forth the conditions of a sale of Regency to Weinmann. One attachment to this Purchase Agreement is a resolution of the company to authorize Seago to execute the Purchase Agreement on behalf of Regency, which is signed by all parties. (Seago again signed for Duhon and Krake). By the terms of the agreement, the Weinmanns agreed to pay Regency 80 percent of the value of the inventory and all personal assets of Regency as well as the value of the good will of the Regency minus $400,000.
On April 15, 2003, the Weinmanns filed a "Motion To Enforce Settlement And Motion For Sanctions," in which the Weinmanns alleged that the failure of defendants to adhere to the terms of the two agreements was affecting the value of the business as well as the relationship between Regency and Ford Motor Company ("Ford"). From the testimony, it is clear that Ford Motor Company was aware of the discord among the members of the L.L.C. that owned Regency and wished to have the ownership issue settled.
After an expedited hearing on the motion, the trial court appointed Patrick K. Schmidt to appraise Regency in accordance with the goodwill section of the Agreement to Purchase. Shortly afterward, the trial court rendered an order to the parties to submit certain documents to the court for purposes of the appraisal.
On July 28, 2003, the parties entered into an Amendment to the Purchase Agreement. In that document it was agreed by the parties that the fair market value of the ongoing business of Regency amounted to $425,246.33, and the goodwill value was $4,321,333.33. In accordance with the original Purchase Agreement, that amount was reduced by $400,000.
The sale was approved by Ford on November 10, 2003, subject to the receipt of certain documents no later than December 18, 2003. The sale was set for December 8, 2003.
On December 3, 2003, the Weinmanns filed a "Motion For Specific Performance And For Sanctions" alleging that defendants have used "stalling tactics" including failing to evaluate the furniture, fixtures *651 and equipment of Regency, and in refusing to pay the Weinmanns the amount necessary to "make them whole" in accordance with the Settlement Agreement. The motion also states Krake indicated that the defendants would not attend the closing on December 8, 2003. The Weinmanns again asked the court for an expedited hearing.
In response, all defendants, with the exception of Williams,[3] filed "Exceptions Of Prematurity And Unauthorized Use Of Summary Proceeding" in which they argued that Regency has not refused to attend the closing of the sale. A letter attached to that motion suggests the Seago Interests and the Weinmanns were at odds concerning the amount owed to the Weinmanns under the Settlement Agreement.
After a hearing, the trial court rendered judgment granting the Weinmanns' motion for specific performance and ordered all parties, except Williams, to appear at the closing and to execute all documents required. The trial court also ordered $1,000,000 to be placed in escrow at the closing, and ordered a hearing on the disposition of these escrowed funds at a later date. The trial court also denied sanctions. It appears the trial court made this ruling to ensure that the sale would go through and the dealership would not be lost because of the extremely acrimonious relationship among the parties.
On December 10, 2003, the sale was completed. Closing documents show that Regency sold to Veterans Ford (The Weinmanns' newly formed L.L.C.) the following assets for the following amounts:

 1. All personal property and equipment $ 435,246.33
 2. All Ford parts and accessories $ 519,264.15
 3. All miscellaneous inventories $ 9,664.83
 4. Labor in progress $ 61,324.37
 5. New 2003, 2004 Vehicles $12,045,564.68
 6. New 2001 Vehicles $ 13,450.00
 7. Used Vehicles $ 865,167.00
 8. Goodwill $ 3,921,333.33

A supplemental closing document suggests a $2,035,178.58 credit is due to the Weinmanns. That amount represented a member distribution owed, but never paid in the amount of $100,000, plus interest, and the equalization of benefits to reflect the percentage of ownership of the parties. The document also states, "Due to time limitations, only the above `Seago Interest benefits' were listed. There is reason to believe that more benefits subject to equalization under the agreement will be found, as time allows." In a document entitled "Regency Ford Disputed Amounts at Closing," Regency disputed all credits suggested in that document with the exception of the $100,000 distribution owed. Additionally, Regency claimed an additional $40,000 for the Ford sign, $252,775 for Ford Land repairs, and $300,000 for "debts after closing."
At the time of closing, $1,000,000 was placed in escrow as ordered by the trial court. The court determined that $1,000,000 was a fair representation of the distributions received by the Seago Interests during the time that the Weinmanns were shut out of the business and did not receive distributions and interest on that money.
Subsequently, the parties filed a "Joint Motion And Order Of Partial Dismissal With Prejudice," which was signed by the trial court on January 13, 2004. In that consent judgment, the parties dismissed all claims and causes of action asserted against all parties with full prejudice "except as to those issues of offset and escrowed funds."[4]
On March 17, 2004, the trial court rendered a judgment decreeing that the Ford sign was included in the original appraised *652 value of the furniture, fixtures, and equipment of Regency and, therefore, no additional funds were due to Regency. That judgment also determined that the claim for repairs to the dealership under the lease with Ford would be determined by the Regency liquidators and that the liquidators obtain three separate estimates for the repairs.
The parties filed various motions and continued the litigation, necessitating a May 17, 2004 order from the trial court granting an emergency hearing to determine the status of the Regency liquidators. The judgment further ordered that the liquidators were to be allowed to pay the outstanding bills of Regency to ensure that the liquidators could perform their fiduciary duty.
The acrimonious litigation continued until December of 2004, when the parties entered into a consent judgment authorizing the liquidators to pay, under protest, any amounts deemed necessary to Ford under the lease provisions. Regency reserved any and all rights to proceed against Veterans Ford for claims for reimbursement.
On July 12, 2005, the Weinmanns filed a motion to reset the hearing for specific performance, originally filed on December 3, 2003. The motion also included a request for the distribution of escrowed funds. The matter was continued several times. In the interim, the trial court held status conferences and considered several motions, and the parties conducted discovery.
After a trial on the merits, the trial court rendered judgment giving the Weinmanns $302,470.64, plus legal interest from the escrowed funds pursuant to the Settlement Agreement. The Reasons for Judgment show that the court considered all of the credits requested by the parties in the documents executed at the time of closing, along with supporting documents. The court found that salaries paid to Duhon and Krake were for the benefit of Regency, as were donations to charitable causes and campaign elections. Further, the court found that demonstrator vehicles used by the Seago Interests benefited Regency.
The court found that the salaries, consulting fees, and personal expenses paid to Seago and Williams were not for the benefit of Regency. Further, the court found the payment of a private investigator hired to follow Weinmann, was not money spent for the benefit of Regency. Ultimately, the court concluded the distributions made by the Seago Interests that did not benefit Regency amounted to $506,176.61. The Weinmanns' proportional share of that amount was calculated to be $202,470.64. The court added the undisputed $100,000 disbursement owed to the Weinmanns to arrive at the final figure of $302,470.64 awarded.
The court further ordered that Regency is liable for the payment of the repairs required to the building pursuant to the lease between Regency and Ford.
Defendants have filed an appeal from that ruling, and both Robert and Cindy Weinmann have filed answers to the appeal, asserting that the trial court judgment is correct and requesting additional credits, or in the alternative, a different calculation of the award.
The trial court gave lengthy Reasons for Judgment. From those reasons, it is clear that the trial court found the Settlement Agreement and the Agreement to Purchase to be two distinct and enforceable documents. The trial court considered the terms of the documents and made rulings based on interpretations of those terms.
*653 In brief to this Court, defendants assign five errors. In the first assignment, defendants argue the trial court erred in holding that the obligations in the Settlement Agreement were not vitiated by novation in the Agreement to Purchase. Defendants assert that the Agreement to Purchase was a novation of a "very hastily drafted Settlement Agreement."
Under our Civil Code, novation is defined as the extinguishment of an existing obligation by the substitution of a new one.[5] The intention to extinguish the original obligation must be clear and unequivocal. Novation may not be presumed.[6]
Initially, we note that there is no clear or unequivocal expression of the parties to extinguish the obligations set forth in the Settlement Agreement by execution of the Agreement to Purchase.
Defendants argue that the Agreement to Purchase is a novation as shown by acts of the parties tantamount to an express declaration. In support of that argument, defendants cite several cases, which were based on the law before the 1984 revisions to the codal articles on novation.[7]
LSA-C.C. art. 1881 provides for an objective novation. Specifically it provides:
Novation takes place when, by agreement of the parties, a new performance is substituted for that previously owed, or a new cause is substituted for that of the original obligation. If any substantial part of the original performance is still owed, there is no novation.
Novation takes place also when the parties expressly declare their intention to novate an obligation.
Mere modification of an obligation, made without intention to extinguish it, does not effect a novation. The execution of a new writing, the issuance or renewal of a negotiable instrument, or the giving of new securities for the performance of an existing obligation are examples of such a modification.
The official 1984 comments to the revision of this article state: "This Article is based on C.C. Arts. 2189(1) and 2187 (1870). It does not change the law, but restates it in a manner that is intended to discourage the finding of novation in the absence of clear indication that a new obligation has been contracted and the original extinguished."
Defendants also argue that the Settlement Agreement was extinguished by the Agreement to Purchase because it requires all parties to "execute global mutual releases and dismiss all litigation with prejudice...."
We agree with defendants' assessment that the Agreement to Purchase is more detailed regarding the sale of Regency to the Weinmanns and that it required the end of litigation. However, we find that the restrictive nature of the Agreement to Purchase precludes a finding of novation. The Agreement to Purchase does not encompass all of the provisions agreed to in the Settlement Agreement. It is clearly intended to ensure a clean transfer of the Ford Dealership from the Seago faction to the Weinmanns in a long and acrimonious litigation. It does not affect the individual rights of the parties to prior disbursements taken by the Seago Interests while *654 the Weinmanns were excluded from the company. Further, the Agreement to Purchase states, "(t)he settlement agreement entered into by the parties is conditioned on the fulfillment of this agreement." That clause in the Agreement to Purchase recognizes that a separate Settlement Agreement is still viable.
The Agreement to Purchase does provide for the sale of Regency to Weinmann, a condition of the Settlement Agreement. However, other provisions of the Settlement Agreement were not extinguished by the Agreement to Purchase. In the Settlement Agreement, the defendants agreed that "Regency will make Weinmanns whole" by making a distribution to the Weinmanns to "bring them up to their proportionate share of total distributions" already dispersed. That portion of the Settlement Agreement is a substantial provision that was not extinguished by the Agreement to Purchase. If a novation had occurred, the matter before the trial court regarding the proper distribution of the $1,000,000 in escrow at the time of the sale of the dealership would be moot.
We believe the Agreement to Purchase concerns the purchase of the business, only one part of the Settlement Agreement. Because a substantial part of the original performance is still owed, there is no novation.[8]
We find no merit in this assignment of error.
In the second assignment of error, defendants argue the obligations in the Settlement Agreement were nullified by the failure of two suspensive conditions; approval of Ford and closing within thirty days. As we understand defendants' argument on this assignment, defendants would have this Court nullify the Settlement Agreement because the sale of Regency to plaintiffs was not closed in a timely manner. However, defendants do not offer an opinion on whether the thirty days to close the sale should be counted from the date of the settlement agreement or the approval of the sale by Ford. In any case, given the history of this litigation and the efforts by defendants to postpone the sale, ultimately requiring the trial court to order defendants to attend, we find this argument unconvincing. Further, the sale has been completed, and defendants have sold the company to the Weinmanns; thus, the conditions of the Settlement Agreement used to support this assignment have been fulfilled. We find no merit in this argument.
In the third assignment, defendants argue the trial court erred in finding Seago and Williams personally liable, along with Regency, to the Weinmanns for the $302,470.64 credit resulting from the trial court's interpretation of various documents associated with the motion for specific performance. Defendants' argument is that Regency, as a legal entity, is solely liable for the agreement to make the Weinmanns whole. Ultimately, the trial court found that the failure to specify the capacity in which Seago and Williams signed the Settlement Agreement subjected both to personal liability. In support of that ruling, the trial court relied on two cases cited by the Weinmanns.[9]
Defendants argue that the cases relied upon by the trial court are distinguishable and that the clear intent of the settlement agreement was to bind Regency as an entity, rather than any of the individuals *655 involved in the company and the agreement.
Whether Seago and Williams signed as individuals or as representatives of Regency is a question of fact.[10] As with the other facts in this tortuous litigation among these parties, the facts of the liability issue are not simple. The finding of personal liability involves a credit owed to the Weinmanns of $302,470.64. The parties were in disagreement as to whether obligation was meant to be borne solely by Regency or whether Seago and Williams were also personally liable.
That amount of the credit is a result of findings by the trial court that salaries for consulting fees paid to Seago and Williams, as well as certain personal expenses paid to Williams, did not benefit Regency. Some of the expenses paid to Williams included tickets to sporting events, condominium rentals, and repairs to Williams' personal camp. The court also found that Regency issued a check in the amount of $100,000 to Weinmann; however, that check was never delivered.
The trial court considered the clause in the settlement agreement which was signed by all members of the LLC, stated that "Regency will make the Weinmanns whole." The trial court further looked to the Operating Agreement of the company for guidance. That agreement provides that;
Regency Motors cannot be bound for an obligation for the payment of money without 75% of the voting interest being present. It further provides that the LLC members have sole authority to manage the company, acting as a group and that any action required to be taken at a meeting of the members may be taken without a meeting by written action signed by the members in number and interest equal to the vote that would be required to take the same action at a meeting.
Based on that language and the fact that the Settlement Agreement is a written action signed by all of the members, the court found Regency to be bound by the agreement and liable for any amount due the Weinmanns under the Settlement Agreement. However, the court also found that, because the signatures do not specify the capacity in which the individual signed, Seago and Williams were personally liable.
Our review of a finding of fact made by the trial court is subject to a manifest error/clearly wrong standard. As recently explained by the Louisiana Supreme Court:
Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.
(Citations omitted.)[11]
Here, we find error in the trial court's ruling that Seago and Williams are personally liable. The Reasons for Judgment state that the finding of personal liability was based on the failure of the signatories to specify the capacity in which they signed the agreement. We believe when *656 all of the documents are considered in this transaction, it is clear that Regency was the sole party liable for any payment to the Weinmanns. Accordingly, we reverse the trial court's finding that Seago and Williams are personally liable to the Weinmanns.
In the forth assignment of error, defendants assert the trial court erred in denying their motion to amend the judgment or, alternatively, to grant a new trial. The basis of the motion was a request for a credit resulting from a distribution of $300,000 made on January 15, 2004. Associated with that distribution is a stipulation by the parties that Regency and/or Seago and Williams receive a credit, "the party or parties entitled to such credit or offset to be determined by the Court from any sums claimed to be owed by said parties to Robert and Cindy Weinmann." This stipulation was not presented to the trial court until after the judgment on the motion for disposition of escrow funds and specific performance filed by plaintiffs, which is the subject of this appeal. We note that Regency listed a $300,000 debt in its dispute as to the credits owed at the time of the closing. However, it is not clear that the $300,000 debt is the basis for the claim for offset made in the motion for new trial.
In written Reasons for Judgment on the denial of the defense motion for new trial, the trial court found no grounds for amendment of the judgment pursuant to LSA-C.C.P. art. 1951,[12] or for the grant of a new trial pursuant to LSA-C.C.P arts. 1971 and 1972.[13] Thus, the trial court only evaluated the motion for new trial under peremptory grounds. The trial court did not consider granting the new trial based on the discretionary grounds provided by LSA-C.C.P. art. 1973.[14]
The request for a credit is based on a distribution and stipulation by the parties three years before in this extended litigation. The focus of the trial court's judgment was the credits that should be applied in the ultimate disbursement of the money held in escrow. We believe the assertion by defendants that they are due an offset for that amount should have been considered by the trial court under the discretionary language of LSA-C.C.P. art. 1973. For these reasons, we grant the motion for new trial for the limited purpose of consideration of whether credit should be given for the $300,000 payment.
In the final assignment of error, the defendants argue that the trial court erred in holding Regency liable for the payment of the Ford Motor Lease repairs. As previously stated, the trial court reserved *657 several issues for later resolution in 2003 in an effort to ensure the sale of Regency would go through with the proper approval of Ford. One of those issues was whether repairs to the building were necessary under the lease, and if so, whether Regency was liable for the repairs.
In making the decision that Regency was liable for any repairs, the trial court considered the lease agreement between Regency and Ford. The lease prohibited the assignment of the repair obligation under the lease could occur without the permission of Ford. The trial court reasoned that, since that required permission did not occur, Regency could not assign any liability for any repair costs to the new company, Veterans Ford.
Defendants argue that the costs are not repair costs but, rather, a "deferred maintenance charge," which could be assumed by Veterans. Consequently, defendants argue the costs arise out of the lease, which Veterans agreed to assume.
We are not convinced by this argument. The lease between Regency and Ford clearly states that prior consent of Ford is required before Regency can "assign, encumber or mortgage" the lease. Weinmann refused to sign the lease assumption and the lease was transferred from Regency to Veterans. It was not assumed by Veterans Ford. Ford conducted two appraisals of the leased property and assessed repairs at $252,775. Under the lease, Regency was required to bring the facility back up to "first class order and repair."
Given the facts presented to the trial court, we find the judgment that Regency was liable for repairs is correct.
As previously stated, both Cindy and Robert Weinmann answered the appeal with the claim that the trial court erred in the exclusion of certain items from the credit awarded and in the calculation of credits due them. Specifically, the Weinmanns argue that item 2(b) in the initial settlement agreement requires that all payments, benefits, salaries, and consulting fees paid to or received by the Seago Interests must be treated as distributions and totaled. Therefore, the Weinmanns take issue with the trial court's exclusion of distributions found to be made for the benefit of Regency.
In making the argument, the Weinmanns relied on the testimony of Ricky Bates, a certified public accountant who testified on their behalf at the hearing. Mr. Bates calculated the credit due the Weinmanns was $1,582,085.52. A review of Mr. Bates' testimony shows that the focus was on the expenditures and distributions paid by Regency. Mr. Bates' testimony did not focus on whether these expenditures were for the benefit of Regency, although some of that issue was brought out by defendants on cross-examination. The Weinmanns argue such a determination is unnecessary because, under the terms of the settlement agreement, all distributions should be credited. The Weinmanns' position is that the settlement agreement encompasses all distributions, even though they may have been of benefit to Regency as well as the Seago Interests. In support of this argument, the Weinmanns again refer this Court to Section 2(b) of the Settlement Agreement.[15]
We are not convinced by this argument. We believe the finding of the trial court *658 that the settlement was intended to correct the financial wrongs done to the Weinmanns while they were excluded from the operations of Regency is supported by the documents and the testimony of the parties. The trial court found that, during the period in question, Regency successfully continued operations and ultimately benefited the Weinmanns as well. This is evident in the value of the company when the Weinmanns ultimately purchased it. We further find that the trial court carefully considered all documents related to the claim made by the Weinmanns and the testimony of Mr. Bates, after which the court made a factual determination on which credits applied. These findings were explained in detail in the Reasons for Judgment. Given the evidence presented and the facts of this case, we find no error in the trial court's ruling. Therefore, we find no merit in this argument.
In the alternative, the Weinmanns argue that the calculation method used by the trial court was incorrect. They assert that, even if the trial court's figure of $506,176.61 was correct, the calculation of percentage was incorrect. The Weinmanns suggest the trial court was required to "gross the distributions to the Seago Interests up to 100%" in order to determine the Weinmanns' 40 percent share.
Simply put, the Weinmanns' argue that the Seago Interests held 60 percent of Regency and the Weinmanns held 40 percent. Thus, any distribution should be divided up proportionately. Since the Seago Interests received distributions totaling $506,176.61, that represented their 60 percent of the distributions. Accordingly, the figure should be grossed up to 100 percent to include the 40 percent the Weinmanns would have been entitled to if they had not been shut out of the business operations.
By these calculations, the $506,176.61 should be "grossed" up to 100 percent or $843,627.68. Then the Weinmanns' 40 percent share should be figured, making it $337,451.07. To that the court should add the $100,000 for the distribution check never received, for a final total of $437,451.07.
In response, the defendants argue that the $506,176.61 is 100 percent of the amount of credit to be used in the calculation required to make the Weinmanns whole pursuant to the settlement agreement.
We find the trial court correctly calculated the amount of the award to the Weinmanns. The trial court found that $505,176.61 in distributions were not made for the benefit of Regency. Therefore, this amount should have been distributed among the parties proportionately with respect to their shares of the company. While the Weinmanns were expelled from the company, the Seago Interests got 100 percent of those distributions. To make the Weinmanns "whole" pursuant to the Settlement Agreement, the trial court gave the Weinmanns their 40 percent of that amount. The trial court was correct in reducing the amount by 40 percent, to calculate the correct award under the Settlement Agreement.
For the above reasons, we find no merit in the assignments argued by the Weinmanns.
For reasons set forth in this opinion, we amend the judgment of the trial court to reverse the finding of personal liability on the part of Seago and Williams. Further, we grant the new trial motion filed by defendants on the sole issue of whether they are entitled to a $300,000 offset. In all other respects, the judgment of the trial court is affirmed. We remand this matter to the trial court for further proceedings in accordance with this opinion.
*659 REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.
NOTES
[1] Weinmann v. Duhon, 01-1267 (La.App. 5 Cir. 3/26/02), 818 So.2d 206, writs denied, 02-2082 (La. 11/1/02), 828 So.2d 574.
[2] LSA-R.S. 12:1335.
[3] Williams engaged new counsel who received and was granted a continuance.
[4] In a subsequent motion, the Weinmanns dismissed Duhon from the entire lawsuit.
[5] LSA-C.C. art. 1879.
[6] LSA-C.C. art. 1880.
[7] Scott v. Bank of Coushatta, 512 So.2d 356 (La. 1987), (applying pre-1985 law), Smith, Howard and McCoy, Inc. v. Acme Wellpoint Corp., 152 So.2d 598 (La.App. 2 Cir.1963) and Placid Oil Co. v. Taylor, 325 So.2d 313 (La. App. 3 Cir.1976).
[8] LSA-C.C. art. 1881.
[9] Flagg Properties, Inc. v. S. La. Stud, Inc., 473 So.2d 129 (La.App. 3 Cir.1985), writ denied, 477 So.2d 107 (La.1985) and Cheek v. Uptown Square Wine Merchants, W.F. Inc., 538 So.2d 663 (La.App. 4 Cir. 1989).
[10] Flagg Properties, Inc., supra.
[11] Ryan v. Zurich Am. Ins. Co., 2007-2312 (La.7/1/08), p. 7, 988 So.2d 214.
[12] A final judgment may be amended by the trial court at any time, with or without notice, on its own motion or on motion of any party:

(1) To alter the phraseology of the judgment, but not the substance; or
(2) To correct errors of calculation.
[13] A new trial may be granted, upon contradictory motion of any party or by the court on its own motion, to all or any of the parties and on all or part of the issues, or for reargument only. If a new trial is granted as to less than all parties or issues, the judgment may be held in abeyance as to all parties and issues. (LSA-C.C.P. art. 1971.)

A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done. (LSA-C.C.P. art. 1972.)
[14] A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
[15] Section 2(b) of the Settlement Agreement provides that:

Any and all payments to or benefits received by the Seago Interests (including salaries or consulting fees) will be considered distributions. A distribution will be made to the Weinmanns in an amount to bring them up to their proportionate share of total distributions.