# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-602


SUZANNE SAVOY SANTILLO

VERSUS

STEPHEN SANTILLO


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20126813
HONORABLE DAVID BLANCHET, DISTRICT JUDGE

**********

## D. KENT SAVOIE
## JUDGE

**********

Court composed of Sylvia R. Cooks, Chief Judge, Shannon J. Gremillion, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Stephen C. Carleton**
**J. Jacob Chapman**
**Carleton Hebert & Shoenfelt, LLC**
**400 Convention Street, Suite 550**
**Baton Rouge, Louisiana 70802**
**(225) 282-0602**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Suzanne Savoy Santillo**

**Philip C. Kobetz**
**Attorney at Law**
**Post Office Box 80275**
**Lafayette, Louisiana 70598-0275**
**(337) 291-1990**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Stephen Santillo**

**SAVOIE, Judge.**

Plaintiff Suzanne Santillo appeals the judgment of the trial court, finding that Blue Collar Enterprises, LLC (Blue Collar) was legally obligated under the Consent Judgment, that Defendant Stephen Santillo operated as a surety for Blue Collar, and that Stephen Santillo's obligations to Suzanne Santillo were extinguished with the bankruptcy of Blue Collar. She further appeals the judgment of the trial court, denying her exception of prescription and request for attorney's fees and costs. Finally, Suzanne Santillo appeals the judgment of the trial court, determining ownership of certain immovables. Stephen Santillo appeals the judgment of the trial court, which found that he is obligated to pay Ms. Santillo the sum of $93,900.00. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

This matter has a protracted procedural history. Stephen and Suzanne Santillo were married on December 18, 1999, and one child was born of the marriage on November 17, 2000. On December 28, 2012, Suzanne Santillo filed for divorce under La.Civ.Code art. 102. The petition for divorce requested that the Antenuptial Agreement entered into between the parties on December 17, 1999, be nullified. In its Reasons for Ruling dated October 10, 2019, the trial court related the relevant facts as such:

> In her original petition for divorce filed on December 28, 2012, MS. SANTILLO alleged that the "Antenuptial Agreement" (hereinafter "Antenuptial Agreement") signed by the parties on December 17, 1999, ". . . was not in conformity with the formalities of Louisiana Law, and particularly Civil Code Articles 2328, et seq. *[sic]* with regard to the matrimonial agreement and same is null and void." In her prayer, MS[.] SANTILLO pray[s], ". . . if the 'Antenuptial Agreement' is found invalid, that there by *[sic]* judgment herein partitioning the community of acquets and gains . . .". In his answer filed on April 23, 2013, MR. SANTILLO denied MS. SANTILLO's allegation that the Antenuptial Agreement was "null and void".

On April 3, 2013, MR. SANTILLO filed a petition for declaratory judgment against MS. SANTILLO. In his pleading, MR. SANTILLO alleges that the law permits matrimonial agreements between the parties that create a regime of separation of property. MR. SANTILLO further alleges that the parties signed the Antenuptial Agreement the day prior to their marriage and that it met all of the formalities of an authentic act. MR. SANTILLO alleges that after the execution of the Antenuptial Agreement, but before the marriage was confected he attempted to modify it by executing a document entitled "Agreement" (hereinafter "unilateral Agreement"). MR. SANTILLO states that the unilateral Agreement fails to comply with the form required by Louisiana law in that it was signed by him and not by MS. SANTILLO. In his prayer, MR. SANTILLO prays that the Antenuptial Agreement be found valid and enforceable and that the unilateral Agreement be found invalid due to lack of MS. SANTILLO's signature. MR. SANTILLO attached the Antenuptial Agreement to his petition as Exhibit "A" and the unilateral Agreement as Exhibit "B".

On June 7, 2013, MS. SANTILLO filed an answer to MR. SANTILLO's petition for declaratory judgment. MS. SANTILLO alleges that the unilateral Agreement was a part of the Antenuptial Agreement, which was not executed before two (2) witnesses and a Notary Public by MS. SANTILLO. As the "document fails to comply with the formalities required by Louisiana law for 'matrimonial agreements' as set out in Civil Code Article 2329 and both documents comprise the entire Antenuptial Agreement of the parties. . ., the entire Antenuptial Agreement fails *[sic]* for lack of formality and failure to comply with form *[sic]* under Louisiana Law." In further answering, MS. SANTILLO alleges that if the Antenuptial Agreement complies with Louisiana law, it should be "eviscerated due to duress, error or fraud." MS. SANTILLO alleges that the Antenuptial Agreement "did not contain provisions which Mrs. Santillo was promised would be placed in the document at the time she signed it." Further, MS. SANTILLO alleges duress stating that she was only informed "of the existence of the contract" on the morning of the day before the wedding, never given an opportunity for an attorney of her choosing to review the contract and that she was "required" to sign the contract. MS. SANTILLO alleged she never saw the document until she was "called" into Chris Richard's office on the morning before the wedding to sign. MS. SANTILLO also alleges that none of the parties' discussions "even intimated that there would be no community between the couple, only that the assets Mrs. Santillo had before marriage would remain her separate property and the assets Mr. Santillo had before marriage would remain his separate property." MS. SANTILLO specifically "pleads the nullity of the contract attached as Exhibit A [Antenuptial Agreement] on the grounds of duress, error or fraud." MS. SANTILLO prayed, ". . . that a

Declaratory Judgment issue herein, declaring the contract attached as Exhibit "A" [Antenuptial Agreement] to STEPHEN SANTILLO's petition to be null and void." Though this pleading is styled as an answer, the Court finds that it is actually an answer and reconventional demand for declaratory judgment that the Antenuptial Agreement be declared invalid. "Every pleading is construed so as to do substantial justice." C.C.P. Art. 865. The caption of the pleading does not control; the court is obligated to determine the substance of the pleading." *Steed v. St. Paul's United Methodist Church*, 728 So.2d 931 (La. App. 2 Cir. 2/24/99), writ denied 740 So2.d 1290 (La. 5/7/99), citing *Smith v. Cajun Insulation Inc.*, 392 So.2d 398 (La.1980) and *Banks v. Rattler*, 426 So.2d 362 (La. App. 2d Cir. 1983).

On September 23, 2013, MS. SANTILLO filed a "Petition to Enforce Contract" seeking the enforcement of an Affidavit (hereinafter "Affidavit") signed by MR. SANTILLO on January 9, 2009, that allegedly declared and acknowledged the ownership of MS. SANTILLO in "37.5% of the entity which owns Jolie's Louisiana Bistro and 10% of the entity which owns Blue Dog Café." MS. SANTILLO alleges that her ownership interest in the Blue Dog Café entity was made with her funds prior to marriage and her interest in the other entity was acquired "because of her labor, skill and industry in helping start and manage" Jolie's Louisiana Bistro. In the petition, MS. SANTILLO states, "That the parties married subject to an alleged Antenuptial Agreement, the validity of which is being challenged by Suzanne Santillo in these proceedings." MS. SANTILLO also alleges that despite demands and requests, both prior and after the marriage and since filing the divorce, "Stephen Santillo and/or the corporate entities he controls have refused to transfer the interest which he acknowledged Suzanne Savoy Santillo owns." MS. SANTILLO also alleges that MR. SANTILLO and/or the entities he owns have refused to pay MS. SANTILLO's pro-rata share of distributions.

On January 14, 2014, the Honorable Judge Susan Theall signed an Order to Fix Trial Date fixing "this action . . . relative to Plaintiff's Petition to Enforce Contract, and the Defendant's Petition for Declaratory Judgment" for trial on April 22 and 25, 2014.

On February 3, 2014, MR. SANTILLO filed an answer to MS. SANTILLO's petition to enforce contract. In the answer, MR. SANTILLO denies that the Antenuptial Agreement is merely "an alleged Antenuptial Agreement". Further, MR. SANTILLO denies all of the other allegations other than he owns a membership interest in Jolie's Louisiana Bistro and that he promised MS. SANTILLO an ownership interest "only insofar as the ownership interest also includes obligations for the entity's debts." MR. SANTILLO also denies that his ownership interest was given to MS. SANTILLO due to her labor, skill and industry in starting and managing the business.

3

On February 24, 2014, MS. SANTILLO filed an amended petition to enforce contract. In the amended petition, MS. SANTILLO alleges that because the ownership interest in By George Restaurants, LLC, d/b/a Jolie's Louisiana Bistro, was acquired by MR. SANTILLO during [the] marriage that she has a community interest therein unless and until he proves the ownership interest is his separate property or proves the validity of the "antenuptial agreements . . . opted out of the community property regime". Further, MS. SANTILLO alleges that even if MR. SANTILLO proves the ownership interest is his separate property, she is entitled to distributions due to his promise of thirty-seven and five tenths (37.5%) percent ownership to her because of her labor, skill and industry. Finally, MS. SANTILLO alleges that the Affidavit executed by MR. SANTILLO on January 9, 2009, reflects this promise.

On February 26, 2014, MR. SANTILLO filed an answer to MS. SANTILLO's amended petition to enforce contract. In his answer, MR. SANTILLO admits he acquired an interest in Jolie's Louisiana Bistro during the marriage but denies there is a community property regime between the parties. MR. SANTILLO also alleges that in 2009, MS. SANTILLO was presented with an opportunity to execute assignments of the interest in Jolie's referred to in the Affidavit, but refused to execute the documents, thereby rejecting the offer to transfer said interest. Thus, MR. SANTILLO alleges, there was no enforceable contract between the parties.

On February 26, 2014, MR. SANTILLO filed an amended petition for declaratory judgment. In the amended petition, MR. SANTILLO replaces two (2) paragraphs in his original petition to delete his allegation that he signed the unilateral Agreement as an attempt to modify the Antenuptial Agreement and that the unilateral Agreement fails as to form. In its stead, MR. SANTILLO pleads that the unilateral Agreement was intended as an offer "to reflect a promise to perform gratuitous actions, none of which were contrary to the provisions contained in the Antenuptial Agreement." In his prayer, MR. SANTILLO again urges that the Antenuptial Agreement is valid and enforceable and that the unilateral Agreement is a separate document that "merely constitutes a recital of gratuitous actions he promised to perform." On March 17, 2014, MS. SANTILLO filed an answer to this amended petition in the form of a general denial.

On April 10, 2014, MR. SANTILLO filed an amended answer to MS. SANTILLO's amended petition to enforce contract. In his answer, MR. SANTILLO alleges that the Affidavit "is not translative of any ownership interest in Jolie's Louisiana Bistro or Blue Dog Café (By George Restaurants, LLC and Blue Collar Enterprises, L.L.C., respectively.)" Further, MR. SANTILLO states that the Affidavit does not follow the restrictions and procedures set forth in the operating agreements of the two (2) entities. Finally, MR.

SANTILLO alleges that the Affidavit "is not translative of any ownership interest in the two condominiums. . . Rather, the language in the acts of sale for the two condominiums, under the public records doctrine, determines ownership of the condominiums." The Honorable Judge Ed Rubin signed an Order on April 10, 2014, granting leave to file the amended answer. On April 11, 2014, MS. SANTILLO filed an opposition to the motion for leave of court allowing MR. SANTILLO to file this amended answer. No order was attached to this opposition and it does not appear to have been acted upon by the Court.

On April 17, 2014, the parties and their counsel met at the Chambers of the Honorable Judge Susan Theall for a period of ten (10) hours. The result of the meeting was a Consent Judgment signed by the Court that same day. The Consent Judgment dismissed MR. SANTILLO's petition for declaratory judgment with prejudice and dismissed MS. SANTILLO's petition to enforce contract with prejudice. These dismissals would have included these pleadings, their respective amendments, along with the answers and amended answers. Also included in this dismissal would have been MS. SANTILLO's answer to MR. SANTILLO's petition for declaratory judgment filed on June 7, 2013, which this Court construes as a reconventional demand for declaratory judgment that the Antenuptial Agreement was "null and void".

On August 14, 2014, MR. SANTILLO filed "Stephen Santillo's Peittion to Determine Separate and Jointly Owned Property and to Allocate Same and for an Injunction Against Disposing, Alienating or Selling of Same" against MS. SANTILLO seeking classification and allocation of items of movable property. In response, on September 9, 2014, MS. SANTILLO filed a dilatory exception of res judicata.

A hearing was held on the exception on January 31, 2017, before the undersigned judge. In ruling on the exception of res judicata filed by MS. SANTILLO, the court specifically found there was no meeting of the minds by the parties as to the validity of the Antenuptial Agreement signed by the parties on December 17, 1999. The dismissal with prejudice by the parties of their competing actions for declaratory judgment regarding the validity or invalidity of the Antenuptial Agreement supports this finding. There is no question MR. SANTILLO thought the Consent Judgment validated the Antenuptial Agreement while MS. SANTILLO believed it was invalidated and the parties were under a community property regime. In actuality, MR. SANTILLO's dismissal gave up his claim that the Antenuptial Agreement was valid and MS. SANTILLO's dismissal gave up her claim that the Antenuptial Agreement was invalid. Neither party intended these consequences. The court denied MS. SANTILLO's exception of res judicata and deferred the assessment of cost to the conclusion of this matter. Further, the Court ruled that the

Consent Judgment signed by the Honorable Judge Susan Theall on April 17, 2014, had not resolved the issue of the validity of the Antenuptial Agreement between the parties. The Court ruled that the parties maintained their right to assert their respective positions as to the validity of the prenuptial agreement in all subsequent proceedings. The Court's ruling is set forth in a Judgment signed on February 23, 2017.

On April 3, 2018, MR. SANTILLO filed a "Reconventional Demand/Petition to Nullify Consent Judgment" against MS. SANTILLO. In his pleading, MR. SANTILLO alleges that his "primary motive in entering into all of the obligations that were imposed upon him in the Consent Judgment was to put to rest the issue of the validity, or invalidity, of the Matrimonial Agreement, and it was his understanding, belief, and primary motive in signing that consent Judgment . . .". Further, MR. SANTILLO asserts that the Consent Judgment acted as a judicial determination of the validity of the Antenuptial Agreement and the invalidity of the unilateral Agreement and Affidavit his signed after [the] marriage. MR. SANTILLO alleges there was "no meeting of the minds of the parties in the execution of the consent Judgment" causing it to be a nullity. Finally, MR. SANTILLO argues that error in his primary motive in executing the Consent Judgment constitutes grounds for nullification.

On November 6, 2018, MS. SANTILLO filed "Plaintiff's Exception of Prescription to Defendant's Reconventional Demand to Nullify Consent Judgment" against MR. SANTILLO. MS. SANTILLO alleged that MR. SANTILLO's cause of action had prescribed based upon the one (1) year prescriptive period contained in La. C.C.P. Art. 2004(B). The hearing on MS. SANTILLO's exception of prescription occurred on May 2, 2019. The Court issued Reasons for Ruling on May 20, 2019, and signed a Judgment that date denying MS. SANTILLO's exception of prescription.

On August 22, 2019, MR. SANTILLO filed an "Exception of Prescription to Wife's Claim of Nullity of Matrimonial Agreement Based Upon Fraud, Error and/or Duress". A hearing was previously set before the Court for the week of August 26, 2019, on the issue of the validity of the Antenuptial Agreement and on MR. SANTILLO's Petition to Nullify the Consent Judgment of April 17, 2014. The Court heard all of these matters on August 27, 2019.

As set forth in the October 10, 2019 Reasons for Ruling and the judgment signed November 15, 2019, the court denied Mr. Santillo's Reconventional Demand/Petition to Nullify the Consent Judgment, finding the Consent Judgment valid. The court further found the December 17, 1999 Antenuptial Agreement is a

"valid matrimonial agreement, not subject to nullity due to alleged fraud, error or duress."

The November 15, 2019 judgment did not conclude the litigation. In its February 26, 2021 Reasons for Ruling, the court explained:

> On January 18, 2018, MS. SANTILLO filed a "Motion and Incorporated Memorandum to Enforce Consent Judgment and for Finding of Constructive Contempt, La. C.C.P. Art. 224(2)." MS. SANTILLO alleges that MR. SANTILLO failed to pay her $46,950.00 under the provisions of the CONSENT JUDGMENT for the year 2017. MS. SANTILLO also alleges that MR. SANTILLO is in constructive contempt of court. This matter was continued until after the Court determined the validity of the CONSENT JUDGMENT as set forth in the prior paragraph.

> On June 21, 2019, MS. SANTILLO filed a "First Supplemental Motion to Enforce Consent Judgment" against MR. SANTILLO alleging that he failed to pay sums due to her under the CONSENT JUDGMENT, more particularly, certain benefits she was to receive as a full-time employee of Blue Collar Enterprises, LLC, d/b/a Blue Dog Café (hereinafter "BLUE COLLAR"). MS. SANTILLO seeks all sums past due under the CONSENT JUDGMENT together with any other sums that may become due prior to and including the date of trial, together with legal interest. Finally, MS. SANTILLO re-urges her motion for constructive contempt of court and seeks sanctions under R.S. 13:4611(1)(d)(ii).

> On January 22, 2020, MR. SANTILLO filed a pleading entitled "Affirmative Defenses." In this pleading, MR. SANTILLO asserts that MS. SANTILLO's negligence or fault should bar her claims under the terms of the CONSENT JUDGMENT because the parties lost their ownership interest in BLUE COLLAR by bankruptcy court judgment. MR. SANTILLO claims that this occurred because MS. SANTILLO failed to complete a settlement agreement, which she had verbally consented to, knowing that her failure would result in the parties' loss of ownership in BLUE COLLAR. As a result, MR. SANTILLO alleges that MS. SANTILLO lost her right to receive owner distributions from BLUE COLLAR as the company was no longer in existence. MR. SANTILLO contends that it was the principal obligation of BLUE COLLAR to make owner distributions to MS. SANTILLO if declared by the company, which had been guaranteed by MR. SANTILLO in the CONSENT JUDGMENT if her distribution was below $45,000.00. As the principal obligation was extinguished because MS. SANTILLO was no longer an owner, MR. SANTILLO asserts that his surety is no longer in effect. Further, MR. SANTILLO alleges that MS. SANTILLO possesses financial assets

that belong to him in the approximate sum of $250,000.00 entitling him to a set off or offset of any amount he owes to her. In addition, MR. SANTILLO alleges that his obligation to pay the difference in the owner's distributions received by MS. SANTILLO in the event the distributions fall below $45,000.00 per year is a suspensive condition which can only be triggered if there is a payment of an owner's distribution to MS. SANTILLO by BLUE COLLAR and the amount of the payment is less than $45,000.00 for that year. Put another way, MR. SANTILLO alleges that the obligation is not imposed upon him in the event BLUE COLLAR makes no owner distributions in a given year. Finally, MR. SANTILLO alleges that his primary motive in agreeing to pay the difference in the owner's distributions received by MS. SANTILLO, if they fell below $45,000.00 per year, was a result of statements made in negotiations to the effect that because he owned sixty-six (66%) percent of the company, and MS. SANTILLO owned only fifteen (15%) percent of the company, his ownership distributions would be four times larger than hers, and thus, he could easily afford to make up the difference. MR. SANTILLO further alleges that he never intended to be personally bound to pay for any sums of money to MS. SANTILLO in the event there were no owner distributions paid to the parties or in the event of MS. SANTILLO's sale of her membership interest BLUE COLLAR, or in the event of her loss of ownership of her membership interest in the company.

As set forth in the Court's prior Reasons for Ruling, on August 14, 2014, MR. SANTILLO filed "Stephen Santillo's Petition to Determine Separate and Jointly Owned Property and to Allocate Same and for an Injunction Against Disposing, Alienating or Selling of Same". In his petition, MR. SANTILLO prays for the Court to determine whether contested movable items are jointly acquired as per the provisions of the ANTENUPTIAL AGREEMENT and, therefore, co-owned by the parties, or if the movables are the separate property of one of the parties. In the petition, MRS. SANTILLO makes the following allegations:

3.

> As part of the incidental matters raised in the divorce proceedings, Ms. Santillo made claims on certain of the businesses that either existed before the marriage or that were created during the marriage. At issue were various documents, including the Ante-Nuptial *[sic]* Agreement, an Affidavit executed by Mr. Santillo that made certain gratuitous assurances to Ms. Santillo, and a third document that purported to transfer certain percentage interests to Ms. Santillo in Blue Collar Enterprises, d/b/a Blue Dog Café and By George Restaurants, LLC, d/b/a Jolie's Louisiana Bistro.

4.

> The parties and their attorney's [sic] successfully negotiated a settlement of those issues, with the assistance of the Court, on April 17, 2014. The ownership of household movables, including furniture, fixtures, artwork, and other items of movable property was not at issue on that date and was not resolved.

On August 20, 2020, MR. SANTILLO filed a "Supplemental and Amending Petition to Determine Separate and Jointly Owned Property and to Allocate Same" supplementing and amending the petition described in the previous paragraph. In the supplemental and amending petition, MR. SANTILLO more specifically alleges facts related to the offset claim contained in the "Affirmative Defenses" filed by him on January 22, 2020. MR. SANTILLO alleges that prior to January of 2009, he had been depositing money as part of his "guaranteed partner payments" from BLUE COLLAR into a brokerage account in the average of $3,000.00 to $5,000.00 per month. That because of fluctuations and losses in the stock market at the end of 2008, the parties agreed that it would be more prudent to deposit this money into a conventional savings account and that MS. SANTILLO would manage the account at Iberia Bank. MR. SANTILLO alleges that MS. SANTILLO received approximately $138,000.00 and that since the initiation of the divorce proceeding, she has failed and refused to account for the monies for the period between March of 2009 and April of 2013. MR. SANTILLO also accuses MS. SANTILLO of closing out a joint checking and savings account in the name of the parties at or near the time the petition for divorce was filed and she retained one hundred (100%) percent of these funds, one-half (1/2) of which belonged to MR. SANTILLO. MR. SANTILLO alleges that the $138,000.00, representing his "guaranteed partner payments", are his separate funds that should be returned to him. In addition to seeking a judgment determining the status of corporeal movables as either co-owned or the separate property of one of the parties, MR. SANTILLO seeks the return of any and all money that was deposited, or that was supposed to be deposited by MS. SANTILLO into a savings account for the benefit of MR. SANTILLO, as well as all other money that was removed from the parties joint accounts without the knowledge of MR. SANTILLO.

The parties stipulated to the filing of the supplemental and amending petition in open court on August 24, 2020. On August 25, 2020, MS. SANTILLO filed an Answer to the Supplemental and Amending Petition denying all allegations.

The Court heard this matter on August 25 and December 9, 2020.

In extensive Reasons for Ruling issued February 26, 2021, and the judgment that followed on March 26, 2021, the trial court ruled: (1) Mr. Santillo was held to be personally obligated to Ms. Santillo in the amount of $93,900.00; (2) all remaining requests made by Ms. Santillo in her Supplemental Motion to Enforce Consent Judgment were denied; (3) Ms. Santillo's Motion for Contempt filed against Mr. Santillo was denied; (4) claims for an offset or for a money judgment made by Mr. Santillo against Ms. Santillo in affirmative defenses and the Amending Petition to Determine Separate and Jointly Owned Property and to Allocate same were denied; and (5) a determination of ownership of approximately one hundred items was made by the court. Suzanne Santillo appealed assigning the following errors:

1. The trial [court] erred in finding that a separate legal entity, Blue Collar Enterprises, LLC ("Blue Collar"), was legally obligated to Ms. Santillo for the numerous unpaid obligations of Mr. Santillo in the Consent Judgment, when Blue Collar did not approve, negotiate, or sign as a party to the Consent Judgment.

2. The trial court erred in interpreting the Consent Judgment to find that Mr. Santillo is liable only for very limited obligations to Ms. Santillo, as a "representative" or "surety" of Blue Collar.

3. The trial court erred in interpreting the Consent Judgment to find that Mr. Santillo's obligations owed to Ms. Santillo were conditioned upon the existence of Blue Collar, and thereby extinguished by its bankruptcy. No such condition is present in the Consent Judgment, and no evidence of such a limitation was introduced at trial.

4. The trial court erred in denying Ms. Santillo's exception of prescription in finding that Mr. Santillo's nullity action was subject to ten-year liberative prescription instead of one-year liberative prescription under La. Code Civ. P. art. 2004.

5. The trial court erred in denying an award of attorney fees and costs to Ms. Santillo as the prevailing party in successfully defending Mr. Santillo's nullity action.

10

6. The trial court erred in determining ownership of certain movable property.

In answer to the appeal, Mr. Santillo maintains that Ms. Santillo is not entitled to any relief she seeks and further contends:

The trial court erred in ordering that [Mr. Santillo] is obligated to pay [Ms. Santillo] the sum of $93,900.00, which sum represents [Ms. Santillo's] claim for minimum guaranteed owner distributions from Blue Collar Enterprises, LLC (addressed in the 6th adjudicatory paragraph of the Consent Judgment dated April 22, 2014), for the years 2017 and 2018. The trial court erred in ordering that payment, as no such guaranteed owner distributions were due by [Mr. Santillo] to [Ms. Santillo] for those years, for the reason that the LLC had no profits, and no distributions were made; further, that the LLC was placed in bankruptcy in the Spring of 2018, and the parties lost their ownership interest in the LLC by order of the United States Bankruptcy Court, Western District of Louisiana, per the order of the Honorable Robert Summerhays dated August 14, 2018. As such, no guaranteed owners distributions should have been owed by STEPHEN SANTILLO for either 2017 or 2018.

Ms. Santillo also filed a motion to strike Mr. Santillo's appellate brief based on non-compliance with Uniform Rules, Courts of Appeal – Rule 2-12.2(D).

## DISCUSSION

### I.    *Motion to Strike Appellate Brief*

Ms. Santillo argues that Mr. Santillo's appellate brief is outside the page limits provided in Uniform Rules, Courts of Appeal – Rule 2-12.2, which states, in pertinent part:

D. The preparation of briefs shall be subject to the following requirements and limitations:

(1) Original briefs on 8 1/2″ x 14″ paper shall not exceed thirty-one pages; reply briefs on such paper shall not exceed thirteen pages. Original briefs on 8 1/2″ x 11″ paper shall not exceed forty-one pages; reply briefs on such paper shall not exceed eighteen pages. These limitations do not include pages containing the table of contents required by Rule 2-12.4, Subsection A(1) and the table of authorities required by Rule 2-12.4, Subsection A(2).

Mr. Santillo's brief is thirty-one pages. However, he includes a five-page "Appendix," which includes additional argument. Mr. Santillo did not request an extension of the page limits. For these reasons, Ms. Santillo's motion to strike is granted in part, insofar as the "Appendix" attached to the Original Brief Filed on Behalf of Defendant – Appellee Stephen Santillo is stricken. This court will consider Mr. Santillo's original brief without the "Appendix" attached.

## II.    *The Consent Judgment*

### A. Legal Obligation of Blue Collar

In her first assignment of error, Ms. Santillo complains that only Mr. Santillo can be legally obligated for the payments owed to her under the Consent Judgment, not Blue Collar. Initially, Ms. Santillo contends any review of the Consent Judgment should be done under the de novo review standard because it involves contract interpretation. We disagree. "Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown." *Wellan v. Comfort Innovations, LLC*, 19-812, p. 4 (La.App. 1 Cir. 6/12/20), 305 So.3d 883, 887. Whether a party signed a contract as an individual or as a representative of a company is a question of fact. *Weinmann v. Duhon*, 08-186 (La.App. 5 Cir. 10/28/08), 997 So.2d 647, *writs denied*, 08-2814, 08-2815, 08-2830 (La. 3/13/09), 5 So.3d 117, 118.

"A contract is formed by the consent of the parties established through offer and acceptance." La.Civ.Code art. 1927. "A consent judgment is a bilateral contract wherein the parties adjust their differences by mutual consent and thereby put an end to a lawsuit with each party balancing the hope of gain against the fear of loss." *Boutte v. Boutte*, 19-734, p. 9 (La.App. 3 Cir. 7/8/20), 304 So.3d 467, 472 (quoting *McDaniel v. McDaniel*, 567 So.2d 748, 750 (La.App. 2 Cir. 1990)).

Ms. Santillo argues that the trial court improperly read numerous terms in the Consent Judgment, specifically that Blue Collar was legally obligated to pay Ms. Santillo rather than Mr. Santillo. It is Ms. Santillo's assertion that Blue Collar is not an obligor under the Consent Judgment because a representative of Blue Collar did not sign the Consent Judgment[1] nor did Blue Collar receive anything of value in exchange for the obligation. Blue Collar was neither a party nor a signatory. Ms. Santillo maintains that the fact that some of the Consent Judgment language allows Mr. Santillo to satisfy some of his personal obligations through payments from Blue Collar does not change the personal nature of his obligation to Ms. Santillo.

The following are the applicable paragraphs in the Consent Judgment:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that effective as of the date of the execution of the assignment, SUZANNE SAVOY SANTILLO shall receive a 15% interest in Blue Collar Enterprises, LLC, d/b/a Blue Dog Café. She shall receive from that date forward 15% of all owner distributions and to include an anticipated frozen food line. In any calendar year should SUZANNE SAVOY SANTILLO's owner distributions fall below $45,000.00 from $46,950.00 STEPHEN SANTILLO shall be responsible for the difference such that SUZANNE SAVOY SANTILLO shall receive $46,950.00.

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that SUZANNE SAVOY SANTILLO shall receive, as a full time employee of Blue Collar Enterprises, LLC, a salary of $600.00 per week. She shall also receive payments toward her long term care policy until paid in full, BMW note on her existing automobile and insurance until the note is paid in full, and payment of health care policy at the limits currently in effect. After the existing BMW note is paid and for 10 years thereafter Blue Collar Enterprises, LLC, shall pay up to $500.00 per month for a car lease for a new car. Further, she shall enjoy the benefits of Business Express for charges at Studio One-Two-One, J & J Exterminating, $145.00 towards Grass Masters per month, and a percentage of other BE credits when available based on her percentage of ownership. In addition to the foregoing, she

---

[1] The signatories on the Consent Judgment are the trial judge, Ms. Santillo, Mr. Santillo and counsel for both parties.

shall receive $2,000.00 in BE credits upon the signing of this Judgment. She shall receive ownership of the golf cart which shall be made available to Blue Dog Café when needed. Further, STEPHEN SANTILLO will provide up to $2,000.00 for the purchase of a lawn mower in May[] 2014 through charges on a Blue Dog Café credit card.

Mr. Santillo contends the Consent Judgment is clear that Blue Collar was obliged to pay her owner distributions as a result of Ms. Santillo receiving a 15% interest in Blue Collar. Mr. Santillo acknowledges that the Consent Judgment contains a personal guaranty by him in the event Blue Collar's owner distributions falls below $45,000.00, Mr. Santillo would be obligated to pay the difference up to $46,950.00. However, Mr. Santillo asserts that the primary obligation for payment of the ownership distributions belonged to Blue Collar. In addition, the Consent Judgment defined other benefits Ms. Santillo was to receive from Blue Collar including salary, car payments, automobile insurance payments, health care policy payments, etc. Mr. Santillo points out that nothing in the Consent Judgment paragraph discussing benefits obligates Mr. Santillo to pay the benefits, but rather it contains obligations owed to Ms. Santillo by Blue Collar.

In its Reasons for Ruling, the trial court addressed this issue, stating:

> It is clear to the Court that the parties considered BLUE COLLAR as the goose that laid the golden egg. The intent of the [applicable paragraphs] from the CONSENT JUDGMENT was for MS. SANTILLO to have a recognized ownership interest in BLUE COLLAR and share in the owners' distributions to include an anticipated frozen food line. MS. SANTILLO also desired to receive benefits as a full-time employee of BLUE COLLAR as discussed above. Just as neither party had a meeting of the minds of the effect of the CONSENT JUDGMENT on the validity of the ANTENUPTIAL AGREEMENT, the Court finds that neither party anticipated the ramifications if BLUE COLLAR ceased to operate and/or they no longer had an ownership interest. This is further fall-out from the ten (10) hour negotiation and gives credence to the old saying, "haste makes waste". Civil Code Art. 2054 provides:
>
> > When the parties made no provision for a particular situation, it must be assumed that they intended

14

> to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
>
> It is undisputed that from the day the CONSENT JUDGMENT was signed on April 17, 2014, through 2016, BLUE COLLAR paid MS. SANTILLO and provided the benefits as set forth in the CONSENT JUDGMENT. On August 14, 2018, pursuant to an order from the U.S. Bankruptcy Court, BLUE COLLAR ceased to exist resulting in the parties' loss of their ownership interest.

The trial court found the present case similar to *Weinmann*, 997 So.2d 647. The *Weinmann* case involved a drawn-out litigation over the dissolution of Regency Motors of Metairie, L.L.C. The matter went to trial and the parties appealed. The appellate court vacated the judgment and remanded the case to the trial court. At this point, the parties entered into a written settlement agreement of which the purpose was to resolve all matters. The L.L.C. was not a party to the settlement agreement, and no one signed the settlement agreement on behalf of the L.L.C. Amongst other things, the settlement agreement stated that "Regency will make [the] Weinmanns whole" and provided distributions be made to the Weinmanns in order to bring them up to their proportionate share of the total distributions. The litigation continued when the Weinmanns filed a pleading alleging that defendants refused to pay the amount necessary to make the Weinmannns whole in accordance with the settlement agreement. The trial court ruled that the defendants were personally liable along with the L.L.C. The appellate court reversed, finding that, after reviewing all of the documents in the transaction, it was clear that the L.L.C. was the "sole party liable for any payments to the Weinmanns." *Id.* at 656.

In the present case, the trial court concluded:

It is undisputed that BLUE COLLAR honored the provisions of the CONSENT JUDGMENT in 2014, 2015, and 2016. Clearly, MR. SANTILLO's sizable ownership interest and status as a manager of BLUE COLLAR resulted in the company undertaking the pertinent provisions in the CONSENT JUDGMENT.

If the intent of the parties in the CONSENT JUDGMENT was to obligate MR. SANTILLO personally for owner distributions to MS. SANTILLO as she contends, it would have been unnecessary for him to guarantee to make up the difference to MS. SANTILLO if owner distributions by BLUE COLLAR fell below $45,000.00 in a calendar year. Nowhere in the CONSENT JUDGMENT does it state that MR. SANTILLO is obligated to pay MS. SANTILLO $46,950.00 per calendar year for the remainder of her life as asserted in her Post-Trial Memorandum. If the intent of the CONSENT JUDGMENT was for MR. SANTILLO to pay MS. SANTILLO $46,950.00 per calendar year for life, it would have stated just that with a credit toward his obligation for any owner distributions received by MS. SANTILLO from BLUE COLLAR.

A clear reading of the Consent Judgment shows that Ms. Santillo received a 15% ownership interest in Blue Collar. As a result, she was to receive annual ownerships distributions paid by Blue Collar, based on her ownership in Blue Collar. Nowhere in the Consent Judgment is Mr. Santillo personally obligated to pay in Blue Collar's stead except when the distributions fall short. Only then would Mr. Santillo be personally obligated to make up the difference. We agree with the trial court that this provision would not have been necessary if Mr. Santillo was personally obligated in the first place. In accordance with the Consent Judgment, Blue Collar paid out ownership distributions to Ms. Santillo in 2014, 2015 and 2016. Even though Blue Collar was not a party to the settlement agreement, Blue Collar can still be obligated to pay Ms. Santillo via the Consent Judgment. See *Weinmann*, 997 So.2d 647. Based on the foregoing, we do not find that the trial court was manifestly erroneous in finding that Blue Collar was legally obligated to pay Ms. Santillo.

16

## B. Suretyship

Next, Ms. Santillo contends that the trial court erred in finding that Mr. Santillo was a surety of Blue Collar. The trial court concluded:

> [T]he Court also finds as fact that MR. SANTILLO signed this provision of the CONSENT JUDGMENT as a representative of BLUE COLLAR.

> Civil Code Art. 3035 defines suretyship:

>> Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so.

> The Court finds that MR. SANTILLO was acting as a surety for BLUE COLLAR in the event the owner distribution to MS. SANTILLO was less than $45,000 in a calendar year. Civil Code Art. 3059 provides that "the extinction of the principal obligation extinguishes the suretyship." It should be noted that BLUE COLLAR was not obligated to make distributions to the owners, which included MS. SANTILLO. The "principal obligation" of BLUE COLLAR was to pay owner distributions to MS. SANTILLO if the company declared them. When MS. SANTILLO was no longer entitled to owner distributions due to the loss of her ownership interest in the bankruptcy, the "principal obligation" was extinct. As such, MR. SANTILLO's suretyship was extinguished.

> Civil Code Art. 3046 provides that the surety cannot assert discharge in bankruptcy of the principal obligor against the creditor as a defense. Revision Comments – 1987 states:

>> (b) . . . A discharge in bankruptcy does not operate as or have the effect of a payment. Bankruptcy does not extinguish the debt but is simply a bar to the enforcement of it. It is this very contingency, the insolvency of the debtor, that necessitates suretyship.

> In the case at bar, the Court does not find that the bankruptcy extinguished a debt of BLUE COLLAR. As stated above, BLUE COLLAR was not obligated to make owner distributions to any of its members, including MS. SANTILLO. Instead, the Court finds that when MS. SANTILLO lost her ownership interest in BLUE COLLAR due to the bankruptcy, she no longer had a right to owner distributions. The result would be the same if MS. SANTILLO sold her ownership interest in BLUE COLLAR. The extinction of MS. SANTILLO's

right to owner distributions extinguished MR. SANTILLO's suretyship to make up the difference.

Ms. Santillo argues that the agreement of suretyship is not express or in writing as required by law. "Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so." La.Civ.Code art. 3035. "Suretyship may be established for any lawful obligation, which, with respect to the suretyship, is the principal obligation." La.Civ.Code art. 3036. "Suretyship must be express and in writing." La.Civ.Code art. 3038. "Suretyship cannot be presumed; an agreement to become a surety must be expressed, and must be construed within the limits intended by the parties to the agreement." *Placid Refining Co. v. Privette,* 523 So.2d 865 (La.App. 1 Cir.), *writ denied,* 524 So.2d 748 (La.1988). The question of whether an obligation is primary or collateral is factual. *Fontenot v. Miss Cathie's Plantation Inc.*, 93-926, 93-927 (La.App. 3 Cir. 3/2/94), 634 So.2d 1380. "Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown." *Wellan v. Comfort Innovations, LLC*, 19-812 (La.App. 1 Cir. 6/12/20), 305 So.3d 883, 887.

Suretyship "need not observe technical formalities but must contain an absolute expression of intent to be bound." *Ball Marketing Enterprise v. Rainbow Tomato Co.*, 340 So.2d 700, 701 (La.App 3 Cir. 1976). In the present case, the pertinent provision of the Consent Judgment states: "In any calendar year should SUZANNE SAVOY SANTILLO's owner distributions fall below $45,000.00 from $46,950.00 STEPHEN SANTILLO shall be responsible for the difference such that SUZANNE SAVOY SANTILLO shall receive $46,950.00." This statement clearly and unambiguously expresses the intent of Mr. Santillo to be

18

bound to pay, up to a certain monetary amount, the owner distributions owed to Ms. Santillo by Blue Collar, should said distributions fall below a certain amount. As such, we do not find the trial court was manifestly erroneous in finding that Mr. Santillo was not the principal obligor but rather bound himself to pay Ms. Santillo as surety for the principal obligation owed by Blue Collar.

### C. Obligations Exinguished by Bankruptcy

Ms. Santillo maintains that the trial court erred when it found that Mr. Santillo's obligations owed to Ms. Santillo were conditioned on the existence of Blue Collar, and therefore, were extinguished by bankruptcy. Ms. Santillo argues that Mr. Santillo was always obligated to pay the annual amount of $46,950.00 regardless of the financial status of Blue Collar. Previously in this opinion, this court found no error in the trial court's finding that the legal obligations owed to Ms. Santillo were owed to her by Blue Collar. Thus, the issue before us is whether these obligations were extinguished by bankruptcy.

Both Mr. Santillo and Ms. Santillo lost their ownership interest in Blue Collar by judgment of the United States Bankruptcy Court, Western District of Louisiana, on August 14, 2018. The trial court found that when Ms. Santillo lost her ownership interest in Blue Collar due to the bankruptcy, she no longer had a right to ownership distributions. The obligation was extinguished. This is the only logical conclusion. We find no error in the trial court's ruling.

### III. *Exception of Prescription*

Next, Ms. Santillo asserts that the trial court erred in denying her exception of prescription. Specifically, she complains that the trial court erred in applying a ten-year liberative prescription to Mr. Santillo's nullity action rather than a one-year liberative prescription. On April 3, 2018, Mr. Santillo filed a Reconventional

Demand/Petition to Nullify Consent Judgment against Ms. Santillo, seeking to nullify the Consent Judgment. In response, Ms. Santillo filed an exception of prescription. Ms. Santillo argued that the one-year prescriptive period applies to all nullity actions. It was Mr. Santillo's contention that the five-year prescriptive period found in La.Civ.Code art. 2031 applies because his action seeks the annulment of a relatively null contract.

Ms. Santillo maintains that the one-year liberative prescription found in La.Code Civ.P. art. 2004 applies to this case. We disagree. Louisiana Code of Civil Procedure Article 2004 (emphasis added) states:

> A. A final judgment obtained by fraud or ill practices may be annulled.
>
> B. An action to annul a judgment *on these grounds* must be brought within one year of the discovery by the plaintiff in the nullity action of the fraud or ill practices.
>
> C. The court may award reasonable attorney fees incurred by the prevailing party in an action to annul a judgment on these grounds.

In his Reconventional Demand/Petition to Nullify Consent Judgment, Mr. Santillo alleges that the Consent Judgment is ambiguous and subject to two interpretations. Additionally, he further alleged that there was no meeting of the minds between him and Ms. Santillo in the execution of the Consent Judgment which should result in the nullification of the Consent Judgment. Nowhere in his pleading does Mr. Santillo allege fraud or ill practice as grounds for the nullity of the Consent Judgment.

Mr. Santillo argued that the Consent Judgment is a contract that is relatively null. Louisiana Civil Code Article 2031 states:

> A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or

20

did not give free consent at the time the contract was made. A contract that is only relatively null may be confirmed.

Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative.

The prescriptive period for annulment of a relatively null contract is found in La.Civ.Code art. 2032, which states, in pertinent part: "Action of annulment of a relatively null contract must be brought within five years from the time the ground for nullity either ceased, as in the case of incapacity or duress, or was discovered, as in the case of error or fraud."

At the hearing, there was some discussion about whether the Consent Judgment is a final judgment or a contract. The trial court cited the case of *Sullivan v. Sullivan*, 42,923 (La.App. 2 Cir. 2/13/08), 976 So.2d 329. In *Sullivan*, the former wife sought to rescind a stipulated judgment. The former husband filed several exceptions, including an exception of prescription. The trial court granted the exception of prescription, without stating any legal authority for the ruling. On review, the appellate court affirmed the trial court on other grounds, stating, "[b]ecause the prescriptive periods urged by John are unpersuasive to this court, we choose to affirm the trial court's dismissal on the basis of the other peremptory exceptions before the trial court." *Id.* at 333-34. However, the appellate court did give its thoughts on the matter in a lengthy footnote, explaining:

> The prescriptive period argued by John is based on the action for nullity of a judgment. La. C.C.P. art. 2001, *et seq.* The Stipulated Judgment merely confirmed the parties' compromise of the issue of spousal support and their establishment of a commutative contract. There is no vice of form or substance of a judgment involved, nor fraud or ill practices in its obtainment. La. C.C.P. arts. 2001 and 2004. On the other hand, viewed as a compromise, rescission for error, fraud or other grounds for annulment of contracts is not the basis of Diane's claim. La. C.C. art. 3082. Therefore, the prescriptive period of La. C.C. art. 2032 is inapplicable. Diane's claim is for the dissolution of a

21

> contract to which Civil Code Articles 2013, *et seq.,* apply. A significant portion of John's performance which extended over a stipulated time period was performed by the time of the alleged breach of the contract in July 2004. Under this view of the parties' contract, we agree with Diane that the general ten-year provision for prescription on a personal action in contract applies. La. C.C. art. 3499.

*Id.* at 333 n.3.

Further, "[a] consent judgment is a bilateral *contract* wherein the parties adjust their differences by mutual consent and thereby put an end to a lawsuit with each party balancing the hope of gain against the fear of loss." Boutte, 304 So.3d at 472 (quoting *McDaniel*, 567 So.2d at 750) (emphasis added).

The Consent Judgment at issue is a contract. It confirmed the compromise of the issues being litigated. The one-year prescriptive period for the nullity of final judgments based on fraud or ill practice does not apply. A "compromise agreement between the parties may be rescinded or declared relatively null on the basis of error." *Morgan v. Foster*, 20-363, p. 8 (La.App. 5 Cir. 4/7/21), ___So.3d___, ___. "Error can manifest itself in two ways: mutually, i.e., both parties are mistaken, or unilaterally, i.e., only one party is mistaken." *Id.* (citing *Peironnet v. Matador Res. Co.*, 12-2292 (La. 6/28/13), 144 So.3d 791). Error is the basis of Mr. Santillo's argument in his Reconventional Demand/Petition to Nullify Consent Judgment. He argues that both he and Ms. Santillo were mistaken in that there was not a meeting of the minds about the outcome of the Consent Judgment. Mr. Santillo believed that the Consent Judgment validated the Antenuptial Agreement, while Ms. Santillo believed that the Consent Judgment invalidated it. Therefore, unlike in *Sullivan*, rescission for error is the basis for Mr. Santillo's nullity action.

Because a compromise agreement is a contract that can be declared relatively null on the basis of error, the five-year prescriptive period found in La.Civ.Code art. 2031 applies. At the hearing on this matter, the parties agreed that if the five-yar prescriptive period applied, Mr. Santillo's nullity action was timely filed. Thus, this assignment is without merit.

### IV.     *Attorney's Fees and Costs*

Ms. Santillo next complains that she should have been awarded attorney's fees and costs because she was the prevailing party in successfully defending Mr. Santillo's nullity action. Ms. Santillo's argument is based on the application of La.Code Civ.P. art. 2004, which states:

> A. A final judgment obtained by fraud or ill practices may be annulled.
>
> B. An action to annul a judgment on these grounds must be brought within one year of the discovery by the plaintiff in the nullity action of the fraud or ill practices.
>
> C. The court may award reasonable attorney fees incurred by the prevailing party in an action to annul a judgment on these grounds.

As explained in the previous sub-section of this opinion, La.Code Civ.P. art. 2004 does not apply to Mr. Santillo's nullity action. As such, this assignment is without merit.

### V.     *Classification of Certain Movable Property*

Finally, Ms. Santillo submits that the trial court erred in determining ownership of certain movable property. Ms. Santillo argues that all movable property for which neither party can demonstrate a purchase with separate funds should be considered jointly owned between Ms. Santillo and Mr. Santillo. Specifically, she lists:

(1) Dutch Dresser

(2)	Large Entertainment Center

(3)	George Rodrigue Print "Love Among the Ruins"

(4)	"Doc and Carol" Concrete Sculptures

(5)	Antique Crystal Chandelier

These items were found by the trial court to be the separate property of Mr. Santillo. The trial court previously found the Antenuptial Agreement to be valid in a judgment dated November 15, 2019. The ruling was not appealed. Because the parties were under a separate property regime during their marriage, there is no presumption that property possessed by either party is community or co-owned. See *Jenkins v. Leonard*, 47,001 (La.App. 2 Cir. 2/29/12), 87 So.3d 230. "Determinations of what is community versus what is separate property are findings of fact." *Young v. Young*, 06-77, p. 3 (La.App. 3 Cir. 5/31/06), 931 So.2d 541, 544. Findings of fact are reviewed under the manifest error standard. *Id.*

Initially, we note that Ms. Santillo complains about the "Doc and Carol" Concrete Sculptures. Regarding this item, the trial court found:

> MS. SANTILLO claims she purchased these items on Magazine Street in New Orleans while shopping with her friend Deann Richmond. MS. SANTILLO testified that she paid for the items with her credit card and that MR. SANTILLO was not with her when she made the purchase. MR. SANTILLO did not refute the testimony of MS. SANTILLO. Therefore, **the Court finds that these items are MS. SANTILLO's separate property** and they are in her possession.

(Emphasis added). The trial court ruled in Ms. Santillo's favor. Consequently, we do not need to review this item.

Similarly, Ms. Santillo complains about the Antique Crystal Chandelier. The trial court ruled:

> MS. SANTILLO testified that this chandelier belonged to her separate estate because it was contained in her check register. MR. SANTILLO testified that he thought he paid for it with a credit card

24

or at least a portion of it. Again, because this was purchased using MS. SANTILLO's separate account where it was the intent of the parties for the monies to be co-owned and used for expenses of the family, **the Court finds this chandelier is co-owned** and is in the possession of MS. SANTILLO.

(Emphasis added). While Ms. Santillo argues that the items listed were found to be the separate property of Mr. Santillo, the Antique Crystal Chandelier was classified as community by the trial court. At one point in her brief, Ms. Santillo requests this court find the listed property to be co-owned. Elsewhere, she contends the Antique Crystal Chandelier should be classified as her separate property.

Regarding Ms. Santillo's "separate account" mentioned by the trial court, elsewhere in its Reasons for Ruling, the trial court explained:

> [T]hat from 2009 through April of 2013 MS. SANTILLO received substantial funds from BLUE COLLAR some of which were deposited into a joint account controlled by her and eventually into her personal checking account. The amount of these funds was at least $138,000.00.
>
> The monies were initially deposited into a joint investment account, then a joint savings account before being deposited into MS. SANTILLO's checking account. While the parties did not agree on all specifics, they did agree that the purpose of the funds deposited in MS. SANTILLO's account was to create an income stream that would allow her the ability to finance the purchase of another rental property without MR. SANTILLO having to cosign the loan. In her testimony, MS. SANTILLO acknowledged that this was not a gift to her from MR. SANTILLO and that she used the money generally to pay family expenses. However, at trial, MS. SANTILLO claimed the money was her income given to her by MR. SANTILLO from BLUE COLLAR. In her deposition taken on March 26, 2014, MS. SANTILLO testified, "It was actually income to Steve that was being put in my checking account." MR. SANTILLO testified that he received a 1099 IRS form from BLUE COLLAR for these funds and that he paid the taxes on this money. **The Court finds that it was always the intent of the parties that this money was to be co-owned funds.**

(Emphasis added).

25

"The trial court is vested with great discretion in effecting a fair partition of community property." *Arterburn v. Arterburn*, 15-22, p. 4 (La.App. 3 Cir. 10/7/15), 176 So.3d 1163, 1167 (citing *Collier v. Collier*, 00-1263 (La.App. 3 Cir. 7/18/01), 790 So.2d 759, *writ denied*, 01-2365 (La. 12/7/01), 803 So.2d 30). Based on the record, we cannot find that trial court was manifestly erroneous in finding the Antique Crystal Chandelier was community property.

The "Love Among the Ruins" print by George Rodrigue was found to be the separate property of Mr. Santillo. The court found:

> MS. SANTILLO testified that this item was given to both of them. According to her testimony, the parties were standing in the restaurant and Mr. Rodrigue said, here, ya'll [sic] take this; I do not have any room for it." MS. SANTILLO testified that she and MR. SANTILLO "put it in the back of the car, ran off to Breaux Bridge and ate boiled crabs and giggled like little kids", because it was the first one they received. MS. SANTILLO testified that the print was 2 x 3, which the Court assumes to be 2 feet x 3 feet. MS. SANTILLO testified that the parties were not married at the time, but were engaged. MR. SANTILLO's testimony was that he was at the restaurant a couple of days before opening and Mr. Rodrigue was hanging all of his art throughout the restaurant. He stated that MS. SANTILLO came to meet him and he introduced her as his friend to Mr. Rodrigue, which was the first time they met. MR. SANTILLO testified that this picture was left over and that Mr. Rodrigue looked at him and said, "I don't have any place for this. This is for you" and handed it to MR. SANTILLO. MR. SANTILLO further testified that MS. SANTILLO was not his fiancée at the time and this was the first time she met Mr. Rodrigue. MS. SANTILLO denies that the print was handed to MR. SANTILLO by Mr. Rodrigue and insists that it was given to both of them. Based upon the credibility of the parties, the Court finds that this print belongs to the separate estate of MR. SANTILLO and is in MS. SANTILLO's possession.

The trial court based its ruling on a credibility determination, which we cannot disturb absent manifest error. We do not find manifest error in the trial court's ruling on this item.

As to the Dutch Dresser, the court found:

26

MR. SANTILLO testified that the item was purchased at Fireside Antiques in Baton Rouge, Louisiana. He produced two checks in the amount of $1,571.04 each representing installment payments on the dresser from his separate account. MS. SANTILLO testified that she put a substantial down payment on the dresser with her credit card. MR. SANTILLO testified that MS. SANTILLO called him from the antique shop and that he put a down payment on the dresser using a BLUE COLLAR credit card. The total price of the dresser was $7,995.00. The Court notes that MS. SANTILLO had the store clerk take a photograph of the dresser and had her write the dimensions and price on the picture, which was introduced into evidence. If MS. SANTILLO was purchasing this for her separate estate, there would have been no need to bring a photograph with the price on it for MR. SANTILLO to see. Based upon the credibility of the parties, the Court finds that dresser is owned by MR. SANTILLO and is in his possession.

The trial court based its ruling on a credibility determination, which we cannot disturb absent manifest error. We do not find manifest error in the trial court's ruling on this item.

Finally, Ms. Santillo finds error with the trial court's ruling on the Large Entertainment Center. She contends this item was purchased through a business express exchange program in which both parties participated. The trial court found:

According to MS. SANTILLO, this purchase was made through Business Express, a bartering exchange in which BLUE COLLAR was a participant. MR. SANTILLO agreed that he purchased this item through BLUE COLLAR'S Business Expense account. At the time the item was purchased, MS. SANTILLO had no ownership interest in BLUE COLLAR. Accordingly, the Court finds that this is the separate property of MR. SANTILLO.

The classification of ownership was based on the testimony and credibility determinations of the trial court, which we cannot disturb absent manifest error. We do not find manifest error in the trial court's ruling on this item.

## VI. Mr. Santillo's Answer to Appeal

Mr. Santillo contends that the trial court erred in finding that he owes Ms. Santillo $93,900.00 for the calendar years 2017 and 2018. This amount stems

from the language in the Consent Judgment regarding the owner distribution shortfall. Specifically, that "[i]n any calendar year should SUZANNE SAVOY SANTILLO's owner distributions fall below $45,000.00 from $46,950.00 STEPHEN SANTILLO shall be responsible for the difference such that SUZANNE SAVOY SANTILLO shall receive $46,950.00." The trial court rejected Mr. Santillo's argument that his obligation to pay the difference is a suspensive condition, finding:

> [T]he personal surety language in the CONSENT JUDGMENT does not require him to pay the distribution shortfall to MS. SANTILLO if there are no owner distributions in a calendar year. The language of the CONSENT JUDGMENT states that if "[i]n any calendar year should SUZANNE SAVOY SANTILLO's owner distributions fall below $45,000.00 from $46,950.00, STEPHEN SANTILLO shall be responsible for the difference such that SUZANNE SAVOY SANTILLO shall receive $46,950.00." As zero (0) is below $45,000.00, MR. SANTILLO is responsible for the difference in the amount of $46,950.00. The Court finds the language of the CONSENT JUDGMENT in this regard is clear and unambiguous.
>
> BLUE COLLAR was in operation in 2017 and 2018 and paid MS. SANTILLO no owner's distributions. The Court finds that MR. SANTILLO, as a surety, guaranteed MS. SANTILLO's shortfall in owner distributions in those years in the amount of $46,950.00 per calendar year. Accordingly, the Court finds that MR. SANTILLO is personally obligated to MS. SANTILLO in the total amount of $93,900.00 and she is entitled to a judgment against him in this amount together with legal interest from the date of judicial demand.

In the recent case *Cureton v. Cureton*, 20-520, p. 11-12 (La.App. 3 Cir. 10/13/21), ___So.3d___, ___, this court explained:

> "A conditional obligation is one dependent on an uncertain event." La.Civ. Code art. 1767. "If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive." *Id.* Contractual provisions should not be construed to be suspensive conditions when possible. *S. States Masonry, Inc. v. J.A. Jones Const. Co.*, 507 So.2d 198 (La.1987); *Burgess v. Shi Gang Zheng*, 17-665 (La.App. 4 Cir. 10/10/18), 257 So.3d 764. The party who asserts a suspensive condition as a defense bears the burden of establishing that there is a suspensive condition which has not been satisfied. *Abraham*

*v. Sperandeo*, 423 So.2d 65 (La.App. 1 Cir. 1982); *Northshore Ins. Agency, Inc. v. Farris*, 634 So.2d 867 (La.App. 1 Cir. 1993).

Mr. Santillo argues that owner distributions must be paid in any calendar year in order to trigger the dividend shortfall. The Consent Judgment does not contain such a provision. Rather, it states, [i]n any calendar year should SUZANNE SAVOY SANTILLO's owner distributions fall below $45,000.00 from $46,950.00, STEPHEN SANTILLO shall be responsible for the difference such that SUZANNE SAVOY SANTILLO shall receive $46,950.00." If the dividend shortfall was only triggered when owner distributions were paid by Blue Collar, this language could easily have been included in the Consent Judgment. As it is, the provision is unclear and ambiguous. "Contractual provisions should not be construed to be suspensive conditions when possible." *Cureton*, ___So.3d at___.

Mr. Santillo further contends that he does not owe the dividend shortfall for 2017 and 2018 because he and Ms. Santillo lost their ownership interest in Blue Collar by judgment of the United States Bankruptcy Court, Western District of Louisiana on August 14, 2018. Mr. Santillo maintains that Ms. Santillo's claim for owner distributions was extinguished by the extinction of the principal obligation. While we agree with Mr. Santillo that Ms. Santillo's claim for owner distributions after August 14, 2018, was extinguished, Ms. Santillo's claim for owner distributions in 2017 and 2018 had already accrued. Ms. Santillo's claim was not extinguished as to owner distributions owed to her prior to her loss of ownership.

For these reasons, we find Mr. Santillo failed to establish that the dividend shortfall was a suspensive condition. This assignment has no merit.

## DECREE

The judgment of the trial court is affirmed.  Each party is ordered to bear their own costs associated with this appeal.

**AFFIRMED.**