No. 4044
Second Circuit

## DOUSAY v. HILLYER-EDWARDS-FULLER, INC.

(December 9, 1931. Opinion and Decree.)
(February 16, 1932. Rehearing Refused.)

Julius T. Long, of Shreveport, attorney for plaintiff, appellant.

Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellee.

McGREGOR, J. On or about January 22, 1929, James R. Dousay, the plaintiff, was injured while in the employ of the defendant, Hillyer-Edwards-Fuller, Inc., at Glenmora, in Rapides parish. Plaintiff was engaged with his co-laborer in sawing down trees and converting them into logs for sawmill purposes. While he was thus engaged on the day named, suddenly a large heavy limb from the tree they were sawing broke and fell a distance of over fifty feet, and, as it was falling, struck the plaintiff on his body about the neck, right shoulder, and back, and knocked him to the ground. For a moment or longer he was unconscious. As soon as possible, the employees of the defendant conveyed the plaintiff to the office of Dr. Archie Taylor, the defendant's physician in Glenmora. Dr. Taylor made as careful an examination as he could at the time. His diagnosis was that there was a fracture of the right scapula or shoulder blade. For immediate relief, the right arm and shoulder were demobilized by binding securely, and the plaintiff was taken to his home. For several months he remained under the treatment of Dr. Taylor, but was never cured.

In October, 1929, the plaintiff was sent to Alexandria and was examined by Dr. R. O. Simmons and his associates. Being unable to determine the nature or extent of his injuries, these physicians placed him in the Baptist Hospital for several days for observation. An X-ray picture was made of his right arm and shoulder, and

the only thing that this picture revealed to these doctors was an exostosis or bony growth on the lower end of the upper third of the right humerus, that portion of the arm that extends from the shoulder to the elbow. This exostosis was removed by a surgical operation, and in the course of time plaintiff was sent home, where these doctors thought he would soon recover.

On May 7, 1930, the plaintiff returned to the office of Dr. Simmons and his associates in Alexandria, still complaining that he could not use the right arm at all. These physicians testified at the trial that at that time they were unable to find anything wrong with him. During all this time and up to August 9, 1930, the defendant paid compensation to the plaintiff at the rate of $15.60 per week. On August 9, 1930, defendant ceased paying this compensation on the theory that the plaintiff had completely recovered from whatever injuries he may have received. As a consequence of the defendant's failure and refusal to pay any further, the plaintiff filed this suit on August 21, 1930.

In his petition, the plaintiff alleges that when the limb struck him, as above related, it fractured or broke the upper bone of his arm, and fractured, bruised, and seriously and permanently injured and impaired the nerves, bones, ligaments, and muscles in his neck, spine, right shoulder, right arm, hand, and other parts of his body, and that the vertebræ in and about his neck and shoulders were fractured or dislocated. He alleges further: That as the result of these injuries he cannot raise his right arm to a level or use it in any way; that there is a lack of sensation in his said arm and shoulder; that the grip in his right hand is greatly impaired; that the said arm and shoulder are of no service to him; and that he has constant pains in and about the place where the said limb struck him in the back.

The defense, as set out in the answer and as developed in the testimony, is that the plaintiff's injuries were never serious and of the nature contended for by him; that, whatever those injuries were, he had fully recovered on August 9, 1930; and that he was a well man on December 15, 1930, the day of the trial, suffering no disability on account of the accident which caused his injuries.

On the trial of the case, plaintiff produced a number of witnesses who testified as to the accident and the injuries received.

(1) Dr. S. C. Barrow, and eminent radiologist of Shreveport, testified that on August 29, 1930, at the request of Dr. O. C. Rigby of Shreveport, he made an X-ray examination of the cervical spine or neck and right shoulder of the plaintiff. He stated that this examination revealed an old fracture of the middle border of the fourth cervical vertebra, with superficial injuries to its anterior lower border. Upon questioning, he stated definitely and positively that the fracture was complete, running downward from within outward, slightly oblique.

(2) Dr. C. H. Potts, a surgeon of Shreveport, testified that he examined the plaintiff on November 7, 1930, and found that he had a complete lack of the use of his right arm and shoulder, and a stiffness of the neck muscles extending down over his shoulder. In the course of his testimony, he said:

"A. Well, in the use of his arms I found that he cannot bring his right hand up to his nipple line in this motion, nor can he abduct away from his side his right arm and hand more than ten degrees. He has

tenderness and pain along the cervical vertebræ, especially the third and fourth and fifth, and anesthesia of his lower hand, especially on the right side, the ulna portion on his right side from the elbow down to the finger where sticking and punching him had no appreciable effect on the right hand side, or the inner side of the thumb finger at all. He had no feeling and practically no sensation to heat and cold and sticking him and the use of his hand was practically negligible. He didn't seem that he could co-ordinate his muscles to grasp with his hand. I asked him to pick up a weight from the floor with his hand and watched him do it and he couldn't pick it up with his right hand. He shifted it into his hand with his left hand and then brought it up, skidding it up as you would skid up dirt with a shovel."

In explaining the cause of the lack of sensation in parts of the right hand and arm, and also the complete lack of use and control of the right arm, Dr. Potts stated that this was due to an injury to the brachial plexus, which is the group of nerves that controls the movements of, and sensation in, the arm. In explaining just what the brachial plexus is, and how he thought plaintiff's condition in his hand, arm, shoulder, and neck was caused by the injury to the cervical vertebræ, Dr. Potts says:

"A. The brachial plexus is the nerves that gives him power or locomotion of that arm inside and they come off of the spinal column just below the site of the injury. The site of the injury shows there was a fracture at the fourth cervical vertebra, and the brachial plexus or large nerves which come off of the cervical spine go underneath the arm and supply the upper arm and lower arm and hand are the nerves from that plexus which come off of the fifth, sixth, seventh, and eighth cervical vertebræ. The fracture occurred at the fourth, which explains his inability to rotate his shoulder and substantially all of the muscles across his scapula, so the fracture and laceration of the areas adjoining the fourth cervical vertebra and the cer- vical nerves come out at that area, and the cervical nerves supply that portion of his back in and around his shoulder."

In his testimony, the doctor stated that he had made a very thorough examination of the plaintiff, and had used all known devices to discover the condition of his nerves which were affected by the injuries, and that in every case he found positive evidence to substantiate the claims of the plaintiff as to his inability to use his right hand, arm, and shoulder, and as to other conditions in his neck.

(3) Dr. O. C. Rigby, of Shreveport, also testified for the plaintiff, and corroborated Dr. Potts in every respect. In the course of his testimony, he said:

"A. I examined him in my office with Dr. Hargrove on August 20th, 1930. I recently saw him in Dr. Potts' office, I don't remember the date, but sometime not many days ago.
"Q. That is when Dr. Potts examined him?
"A. Yes, sir, when Dr. Potts examined him. On August 20th, I examined Mr. Dousay and I found the following: The back of his neck on the right side was tense, complained of pain in the shoulder, and on moving the shoulder it aggravated his pain. We tried the usual tests like Dr. Potts described, sticking him and pricking him with a pin and using hot and cold. We had him blindfolded—Dr. Hargrove blindfolded him and we pricked him and tested out the nerves as best we could in that way, and we came to the conclusion from our examination that the cervical plexus and brachial plexus were injured. And we suspected a fracture of the cervical vertebra and referred him to Dr. Barrow for his examination, but I hadn't been able to see the plate until here this afternoon. I learned from Dr. Barrow however that there was a fracture of the fourth cervical vertebra. The sensation as described by Dr. Potts was just about the same as I would describe it.
"Q. You heard Dr. Potts' testimony?
"A. Yes, I heard his testimony, in that

there was lack of pain or sensation to heat or cold, mostly on the outer border of the arm. His ability to use his arm was lacking and we tried to test out his grip and things like that, but with no success. About all that a man can say about it is that in these injuries where you have injury to the vertebræ you usually have stiffness of the area adjacent to it, and I think these injuries play a part in keeping him from moving it, and he has that kind of disability. Dr. Adair had a fractured vertebra and the location of it would not permit him to move his vertebræ at all in the region of the back, and as all of us know, he would have to turn all the way around to talk to you if you called his name. Most all back injuries are like that, especially in the cervical vertebræ, and places like that which cause them to have to turn their bodies around to look, because if he turned that disabled member around it wouldn't be very healthful for it."

Dr. Rigby stated further that he and Doctors Potts and Hargrove had examined the plaintiff before the X-ray picture was made by Dr. Barrow, and that they had found that the brachial plexus, as well as the cervical plexus, were both injured to such an extent that there must have been a fracture of some of the cervical vertebræ. It was after this diagnosis that the X-ray examination was made by Dr. Barrow. When this X-ray examination was made, it confirmed their beliefs and diagnosis. It was subsequent to this first examination and diagnosis that Doctors Potts and Rigby made their test of the plaintiff's arm and hand and discovered the lack of sensation and control, as testified by them.

(4) Dr. J. A. Packer of Alexandria examined the plaintiff, and his testimony corroborates that of the three physicians from Shreveport. This examination was also made just prior to the trial of the case.

(5) The plaintiff, in testifying in his own behalf, stated: That the limb that fell struck him about his neck, shoulders, and arm; that he has been totally disabled ever since; that he has no use of his right arm and hand, back, or neck; that he can pick up nothing; cannot stoop over; that there is a soreness in the back of his neck all the time; that if he stirs or rides this soreness is worse; and that he has very little sensation left in his right hand and arm.

(6) D. C. Goodman, a witness for the plaintiff, testified that he had always been a willing worker, but since the accident had been unable to do any work of any consequence.

(7) Henry Bass, a witness for the plaintiff, testified that he had always been a hard worker and worked all the time before he was hurt; but that he had never seen him trying to do anything since.

(8) John Hilton, plaintiff's co-worker, at the time of the accident, corroborated the plaintiff's description of the accident, and testified further that he was a hard worker.

The defendant produced five witnesses at the trial, all of them eminent physicians of Alexandria and Glenmora. Their testimony is unanimous to the effect that the plaintiff was never injured to the extent that he claims, and that at the time of the trial he was fully recovered.

(1) Dr. Archie Taylor of Glenmora was the physician to whom the plaintiff was carried immediately after the accident occurred. He testified that when the plaintiff was brought to him on January 22, 1929, he diagnosed the injury as a fractured right scapula or shoulder blade, and treated him accordingly. He was of the opinion that this diagnosis was right until an X-ray examination disclosed to him that there had been no fracture there. He does not believe that the X-ray picture made by

Dr. Barrow discloses an old fracture. He states, however, that the plaintiff has always complained that he cannot use his right arm and hand and that, so far as he knows, he has never used or raised them since the accident. He admits further that the physical condition of the plaintiff's two hands indicates that the right hand has been used less than the left.

(2) Dr. R. O. Simmons, a physician and surgeon of Alexandria, testified that the plaintiff was brought to him and his associates for examination in October, 1929. Upon examination, they found an exostosis on the right humerus and removed it, and, after a few days' treatment, dismissed him and considered him cured. He testified that on the day of the trial he and Drs. Barber, Taylor, and Rand had examined the plaintiff and found the muscles of the right arm a little larger than those of the left, and that they found no atrophy. He stated that he had never examined his neck, but it was his opinion that there was no stiffness there. It is his belief that there has never been any fracture in any of the cervical vertebræ, and that the X-ray picture made by Dr. Barrow does not reveal any. He states further that he never made any examination of the cervical vertebræ, for the reason that no complaint had been made by plaintiff that would indicate any disturbance there. It is very significant, however, that in the course of his testimony he stated:

"In going through the routine of his examination, we had a picture made of his arm and shoulder where he was complaining, up to the vertebra, *which showed slight radiations of the vertebrae, but not enough to tell of any damage there because of the fact he hadn't complained of anything wrong there.*" (Italics ours.)

(3) Dr. H. O. Barker, a radiologist of Alexandria, testified that he saw nothing in the X-ray picture of Dr. Barrow to indicate a fracture of any cervical vertebræ. It is his further testimony that the plaintiff's trouble is due to arthritis, caused by infections of some kind that had no connection with the injuries received by the plaintiff.

(4) Dr. Paul K. Rand, a radiologist of Alexandria, testified that he and Dr. Barker had tested the nerves of the right hand, arm, and shoulder of the plaintiff in November, 1929, over a year before the trial, and found that his complaint was unfounded. He testified that he found no indication of an old fracture in any of the cervical vertebræ in the X-ray picture made by Dr. Barrow.

(5) Dr. Barker testified that in October, 1929, he assisted in the examination of plaintiff's nerves, and found no trouble. He admits, however, that he has never seen the plaintiff raise his arm voluntarily.

The trial judge wrote an able and lengthy opinion, and found that the plaintiff had failed to prove his disability, and therefore rejected his demand, and judgment was rendered and signed accordingly. From that judgment, the plaintiff is prosecuting this appeal.

OPINION

This case involves only questions of fact. Plaintiff received his injuries on January 22, 1929, and from that date until August 9, 1930, he was under medical treatment at the expense of the defendant, and every one must have considered that there was some merit at least in his contentions as to his disability, for he was paid compensation regularly up to the time when he was dismissed by the physicians of the defendant; that is to say, August 9, 1930.

Aside from all medical testimony, the fact remains and it must be admitted that

the plaintiff was seriously injured. Before the accident he was a hard, willing worker. Since the accident, and up to the trial, he had done no work, and was not able to do any. One of the easiest charges to make and the hardest to prove or disprove is that a man is pretending to suffer when he is not. In this case, the plaintiff swears that he has not worked since the accident, for the reason that he has been unable to do so. He is corroborated in this to a large extent by the fact that he has not been shown by any one to have worked or to be able to work. The company's physician kept him under treatment from January until October, without giving him any relief. This physician certainly, in the beginning, believed that the plaintiff had been injured, and believed him when he said he could not use his arm after the injury. He knew that, being struck as he had been by this limb, he must have been severely injured. He therefore decided that the scapula or shoulder blade was broken. Subsequently an X-ray examination disclosed no fracture, but this same X-ray did disclose a very serious exostosis on the right arm. This was removed, and the plaintiff was dismissed on the theory that this was his only injury. This opinion of the defendant's physicians evidently was not justified, for the reason that on different occasions thereafter the plaintiff was compelled to report back to them for relief, and on these occasions he continued to complain of the same trouble.

It is to be noted that the defendant's physicians in Alexandria, in having an X-ray examination made of the plaintiff, X-rayed only those regions in which they understood the plaintiff was locating pain. It would seem that where a man had been struck with a limb, as this man had been, X-ray examinations should have been made of the entire region of the neck. A man cannot always locate the exact seat of pain, particularly when it is very general. This man's arm, shoulder, and shoulder blade were X-rayed by the defendant's physicians, but the neck was not, for the only assigned reason that he had never complained of it, and had never located any pain there. In his testimony, Dr. R. O. Simmons stated that:

"We had a picture made of his arm and shoulder where he was complaining up to the vertebra, *which showed slight radiations of the vertebrae, but not enough to tell of anything there because of the fact he had not complained of anything wrong there.*" (Italics ours.)

If an X-ray examination had been made of all the cervical vertebræ and not just *up to them*, it is more than likely that a condition would have been revealed that would have explained plaintiff's trouble, for, when the picture was made just up to that point, a slight radiation was shown. It is to be regretted that these physicians did not follow up this indicated source of trouble by having an X-ray examination of the vertebræ themselves. It would seem to the ordinary laymen that, when a man complains as plaintiff was complaining, all regions where nerves affecting the hand and arm originate should have been examined most carefully. That appears to have been the theory of Dr. Rigby and Dr. Potts of Shreveport in having Dr. Barrow make an X-ray examination of the cervical vertebræ of the plaintiff. They discovered lack of sensation and control in certain portions of the right hand and arm. They knew that the nerves involved in those regions originated around the fourth, fifth, and sixth cervical vertebræ. They therefore had an X-ray examination made of these. This picture revealed an old fracture of the fourth vertebra. These doctors concluded that, if this limb struck with such terrific force as to fracture this ver-

tebra, the others were bound to have been injured to such an extent as to seriously impair all the nerves emanating therefrom, even though no visible trace may have been left on the bony structure of the vertebra. Their diagnosis was perfect, and Dr. Barrow's X-ray examination confirmed it in every part.

It is true that two radiologists and other physicians, testifying for the defendant, disagree with Drs. Barrow, Rigby, and Potts, but when an eminent radiologist, such as Dr. Barrow is known to be, makes, an X-ray examination and declares that he finds certain conditions, we are bound to believe him, and, in making this statement, we cast no reflections on the equally eminent physicians and radiologists that disagree with him. The plaintiff's witnesses all declare that they found certain conditions to exist. They are men that stand high in their profession, and we must believe them. The fact that others, equally as eminent in the same profession, do not see what the doctors testifying for the plaintiff say they saw is. not conclusive, and is not sufficient to disprove the plaintiff's testimony. It is the difference between positive and negative testimony. One may swear positively that he saw a certain party at a given time and place, while a dozen other men with equal opportunity of observation may swear positively that they did not see him. The positive testimony of the one witness cannot be overcome by the negative testimony of the dozen. And, in addition to this fact, at some time or other in the course of their examination, all these physicians testifying for the defendant practically admit that at the time of the trial they felt that something was wrong with the plaintiff, even though the weight of their testimony is to the effect that the plaintiff is not disabled as he thinks or says he is.

We have the highest regard for all the eminent physicians who have testified in the case on both sides, and certainly the able opinion of the judge of the lower court is entitled to the greatest consideration. It is with regret that we ever disagree with our brethren of the lower court, but after reading all the testimony in this case and reviewing all the facts and circumstances, and after the most careful study and earnest consideration, we have reached the conclusion that the judgment appealed from is erroneous, and should be reversed.

In our opinion, the plaintiff, at the time of the trial, was totally disabled, and, as far as we can determine, this disability will be permanent. It is not a question of confining the injury to a hand or arm or other member. His injury is general, and disabled his entire body. If he should subsequently recover, the law provides relief for the defendant. As to the compensation to be awarded, we find that the plaintiff was receiving on the average $24 per week. His compensation should be on that basis.

For the reasons assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, annulled, reversed, and set aside, and it is further ordered that there be judgment herein in favor of the plaintiff, James R. Dousay, against the defendant, Hillyer-Edwards-Fuller, Incorporated, for the sum of $15.60 per week for a period of four hundred weeks beginning January 22, 1929, with five per cent interest on all past-due weekly payments from their respective maturities, subject to a credit for the amount paid up to and including August 9, 1930; the defendant to pay all the costs of both courts.