# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**24-160**

**STATE OF LOUISIANA**

**VERSUS**

**CASEY MICHAEL HATCH**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7456-20
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**Stephen C. Dwight, District Attorney**
**Karen C. McLellan, Assistant District Attorney**
**Fourteenth Judicial District Court, Calcasieu Parish**
**Post Office Box 3206**
**Lake Charles, Louisiana  70602**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
　　**State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
　　**Casey Michael Hatch**

**Casey Michael Hatch**
**In Proper Person**
**Louisiana State Penitentiary**
**Camp – D, Eagle – 2**
**Angola, Louisiana  70712**

**WILSON, Judge.**

A jury found Defendant, Casey Michael Hatch, guilty of two counts of second degree murder, in violation of La.R.S. 14:30.1. The trial court sentenced Mr. Hatch to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on each count. Mr. Hatch now seeks review of his conviction. For the following reasons, we affirm.

I.

## ISSUES

We must decide:

(1) whether no rational trier of fact could have found that Casey Hatch was able to distinguish between right and wrong at the time of the offenses and was therefore legally sane; and

(2) whether the trial court erred in denying defense counsel's motions for mistrial due to a tainted jury venire.

II.

## FACTS AND PROCEDURAL HISTORY

The victim, Marie Borque, had been living with the defendant, Mr. Hatch, in his trailer along with her two children. On the evening of January 14, 2020, at around 10:30 p.m., a 911 dispatch operator for Calcasieu Parish received a call from Ms. Borque, in reference to a fire at 300 Dobbertine Road, Lot 20 in Lake Charles. Ms. Borque told the dispatcher that she and her children were trapped inside the trailer home and were unable to breathe. The dispatcher advised Ms. Borque to try to break a window, but she was unable to do so. The dispatcher then instructed her to put blankets underneath the door to stop the smoke from entering the room. Eventually Ms. Borque stopped responding to the dispatcher.

Deputy Aaron Miller of the Calcasieu Parish Sheriff's Office reported to the scene of the fire and spoke with Mr. Hatch. Deputy Miller asked Mr. Hatch if everyone was out of the trailer, and he responded yes. Deputy Miller then proceeded to warn neighbors of the fire. After the fire was extinguished, a firefighter for the Lake Charles Fire Department searched the home and subsequently found Ms. Borque and her two children.

Mr. Hatch was provided treatment at the scene and transported to St. Patrick's Hospital in Lake Charles. Mr. Hatch was later transferred to Our Lady of Lourdes Hospital in Lafayette where he told staff that he burned his trailer down. While receiving treatment in Lafayette, Dr. Amanda Phillips, the Lafayette Parish Deputy Coroner, executed an emergency certificate on his behalf to have him evaluated.

Ms. Borque's daughter suffered carbon monoxide poisoning and was pronounced dead at St. Patrick's hospital. Ms. Borque passed away the next day at Our Lady of Lourdes Hospital. Ms. Borque's son survived the fire. An autopsy was performed on Ms. Borque's daughter and the death was ruled a homicide with smoke inhalation listed as the cause of death. An autopsy was not performed on Ms. Borque, but the Calcasieu Paish Coroner believed her death to be the result of smoke inhalation as well.

On June 4, 2020, Mr. Hatch was charged by grand jury indictment with two counts of second degree murder. On June 8, 2020, Mr. Hatch entered a plea of not guilty and not guilty by reason of insanity. On July 30, 2020, a motion for appointment of sanity commission was filed and granted.

On January 20, 2021, the parties stipulated that Mr. Hatch was competent to stand trial; however, the trial court reappointed the sanity commission to determine his competency at the time of the offense. On May 26, 2021, the trial court found

that Mr. Hatch was competent at the time of the offense. On October 31, 2022, defense counsel requested that Mr. Hatch be reevaluated by the sanity commission, but the trial court denied the motion.

On July 21, 2023, Mr. Hatch was sentenced to life imprisonment at hard labor without benefits for each count. The trial court ordered the sentences to run consecutively. On August 21, 2023, Mr. Hatch filed a motion to reconsider sentences which the trial court denied without a hearing. Mr. Hatch now appeals his convictions asserting two counsel-filed errors and one pro-se error.

III.

**LAW AND DISCUSSION**

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

**INSANITY DEFENSE**

In his first counsel-filed assignment of error, Mr. Hatch asserts that no rational trier of fact could have found that he was able to distinguish between right and wrong at the time of the offense and was thus legally sane.

In *State v. Silman*, 95-154, p. 7 (La. 11/27/95), 663 So.2d 27, 32, the supreme court gave a detailed analysis of the affirmative defense of insanity:

> In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14; *State v. Williams,* 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the

3

evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. *State v. Bibb*, 626 So.2d 913 (La.App. 5th Cir.1993), *writ denied*, 93-3127 (La. 9/16/94); 642 So.2d 188; *State v. Claibon*, 395 So.2d 770 (La.1981). Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. *State v. Peters, supra; State v. Claibon, supra.*

In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters*, 94-0283 (La. 10/17/94); 643 So.2d 1222; *State v. Nealy*, 450 So.2d 634 (La.1984); *State v. Price*, 403 So.2d 660 (La.1981); *State v. Claibon, supra; State v. Roy*, 395 So.2d 664 (La.1981).

In brief, Mr. Hatch argues that he presented sufficient facts at trial to prove by a preponderance of the evidence that he could not distinguish right from wrong at the time of the offenses, and thus, he should have been found not guilty by reason of insanity. To support his argument, Mr. Hatch cites *State v. Armstrong*, 94-2950 (La. 4/8/96), 671 So.2d 307, wherein the supreme court overturned a conviction for second degree murder after finding the defendant not guilty by reason of insanity. In reversing the conviction, the supreme court stated the following:

> [T]he defense's case on insanity consisted of the twenty-five year history of mental illness with delusions, auditory hallucinations, religious obsessions and occasional psychotic episodes, particularly when defendant was subjected to stress or failed to take his medication; the testimony of three psychiatrists and one psychologist who opined that defendant could not distinguish right from wrong at the time of the killing; evidence of defendant's dispute with his bank causing him stress, a precursor of psychotic episodes, and of his involuntary commitment to a mental institution shortly before the killing and his violent behavior there; and extensive evidence of

4

bizarre behavior, before and after the killing, which was consistent with conduct that has led to his numerous hospitalizations.

. . . .

Other evidence deemed significant by the court of appeal was testimony that defendant was able to communicate at pertinent times, since inability to communicate is one of the principal symptoms of a person's being in a psychotic state. However, the most significant evidence in this respect came from the officers who [witnessed] the decapitation. They testified that defendant appeared to be in a trance, was non-communicative despite their best efforts, and ignored their commands to drop the knife although they had weapons backing up their commands.

Other evidence stressed by the district attorney was the fact that defendant did not attempt to kill, or even threaten, anyone but Rev. Neal and that he had sat in his car peacefully until he saw Rev. Neal enter the mortuary. Such behavior, however, is consistent with the delusion that Rev. Neal was the anti-Christ and with the auditory hallucination telling defendant "That's him." The doctors who found defendant insane at the time of the crime commented that he was no danger to anyone but the anti-Christ of his delusion. The fact that the policemen did not feel threatened was not inconsistent with that delusion or with the hallucinatory command.

As to defendant's allegedly selective responses to hallucinatory voices, one telling him to kill and the other telling him later that killing is wrong, it was the very nature of defendant's delusion that Rev. Neal was the anti-Christ that compelled defendant to send the anti-Christ to hell. Evidence that a person, in a psychotic state and operating under a long-standing delusion about the anti-Christ, is unable to evaluate competing auditory hallucinations is hardly preponderating proof of ability to distinguish right from wrong.

Moreover, the fact that defendant decapitated Rev. Neal in view of several police officers militates strongly against a conclusion that he knew he was doing wrong at the time. Indeed, the most significant evidence of ability to distinguish right from wrong in many insanity defense cases is evidence of the accused's attempts to hide evidence of the crime. Conversely, evidence of criminal conduct in plain view of law enforcement officials is a significant indication of inability to distinguish right from wrong.

We conclude that the evidence of insanity, viewed in the light most favorable to the prosecution, clearly preponderates in favor of the defense and that a rational juror could not have reached a contrary decision.

*Id*. at 312–13.

Defendant asserts his case is similar to *Armstrong*, as he also had a long history of mental illness, psychotic episodes, auditory hallucinations, and being admitted to mental institutions. Defendant further contends he "did not attempt to hide his culpability but rather, admitted that he started the fire and 'forgot' to warn [the victims] when he ran out of the trailer."

In opposition, the State contends that the defense failed to prove by a preponderance of the evidence that Mr. Hatch could not distinguish between right and wrong at the time of the offense. Although the State admits Mr. Hatch suffered from some type of mental illness, the State argues there was sufficient evidence to prove that Mr. Hatch was, in fact, sane at the time of the offense. To support its argument, the State notes Mr. Hatch complied with commands by law enforcement and paramedics at the scene, stated he did not want to be judged, and changed his version of the events numerous times. The State also reiterates expert testimony that Mr. Hatch had a history of malingering and that his conduct at the time of the offense was not in response to psychotic delusions or hallucinations.

After reviewing the record, we find that Mr. Hatch's case bears no resemblance to *Armstrong*. While we acknowledge that Mr. Hatch has a history of mental health issues, Mr. Hatch failed to submit any evidence that demonstrated that his mental illness had such an effect on him that he could not distinguish between right and wrong when he committed the offense.

Two deputies with the Calcasieu Parish Sheriff's Office testified that they interacted with Mr. Hatch at the scene. They both noted that Mr. Hatch told them that no one else was in the home and he did not seem to be exhibiting any signs of mental illness at the time. Nurse James Miceli, who treated Mr. Hatch in the intensive care burn unit, testified that Mr. Hatch understood questions and told him that he burned down his trailer. Nurse Miceli also testified that when the deputy

6

coroner questioned Mr. Hatch to assess his mental state, Mr. Hatch admitted to burning his home because he wanted to. Deputy Coroner, Dr. Amanda Phillips, testified that Mr. Hatch stated, "I just wanted to burn my house down." She also documented that Mr. Hatch did not express audio or visual hallucinations but did express suicidal and homicidal ideations.

There was no evidence presented that Mr. Hatch was motivated by some mental disturbance to burn down his trailer. Moreover, both experts found that Mr. Hatch was not legally insane. Dr. Darrell Turner, a clinical psychologist and expert in forensic psychology, was appointed by the trial court to assess Mr. Hatch. Dr. Turner noted several inconsistencies in Mr. Hatch's recitation of events which made him believe that Mr. Hatch was malingering. He noted that there is generally a consistency in the description of specific delusional beliefs across different periods of active mental illness. He also noted that Mr. Hatch had mentioned in interviews that he did not want to be judged. Dr. Turner explained that when someone does not know what they did was wrong, they are not concerned about being judged. While he believed that Mr. Hatch did have mental illness, he believed it was substance induced psychosis due to drug use and it did not prevent Mr. Hatch from knowing that what he did was wrong.

Dr. James Anderson, recognized as an expert in forensic psychiatry, also noted the many inconsistencies in Mr. Hatch's story. For instance, Mr. Hatch initially stated that he poured acetone all over the trailer and lit it on fire, but then later stated that he did not know how the fire started. He also was inconsistent on whether he knew Ms. Borque was in the house. Dr. Anderson adopted the diagnosis of schizophrenia and believed that Mr. Hatch was experiencing symptoms of psychosis at the time, however, his conduct was not in response to

psychotic delusions or hallucinations. Dr. Anderson concluded that Mr. Hatch was capable of distinguishing right from wrong.

Although Mr. Hatch was able to establish that he suffered from mental illness, he failed to prove by a preponderance of the evidence that he was legally insane at the time he committed the offenses and that a rational trier of fact could not have found otherwise. Accordingly, this assignment lacks merit.

Alternatively, Mr. Hatch argues that at the most, he should be found guilty of negligent homicide due to his gross disregard for the consequences of his actions. Mr. Hatch claims that his action of setting his bedroom ablaze was a mere deviation from the standard of care expected of a reasonably prudent person, rather than second degree murder.

Negligent homicide is defined in La.R.S 14:32(A)(1) as the "killing of a human being by criminal negligence." Criminal negligence is defined as "when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12.

The record does not present any evidence in which the jury could have inferred that the deaths of Marie Bouque and her daughter were due to negligent homicide. First, multiple people testified that Marie and her children were living with Mr. Hatch prior to the incident, and Dr. Anderson testified that when Mr. Hatch was asked if he told Marie he set the fire, Mr. Hatch said he meant to but did not, which would indicate that he knew Marie and her children were home at the time he set the fire. Second, when Deputy Miller and Deputy Duhon arrived on scene, Mr. Hatch stated that no one else was in the trailer; however, he subsequently told Major Reed and Detective Mier that he intentionally set the fire,

8

claiming he wanted a change and did not want to be judged. Third, Mr. Hatch admitted that he and Marie got into an argument prior to the incident, which indicated that he had motive. Fourth, Florina Mendez, Marie's long-term friend, testified that Marie felt unwelcome in Mr. Hatch's home and that he had previously locked Marie and her children out of the home. Fifth, Shirley Holmes, Mr. Hatch's stepfather, testified that a day before the incident he was concerned about Marie and her children's safety due to Mr. Hatch not taking his medication. Sixth, Jeremy Leblanc, the fire investigations expert, testified that the fire was intentionally set by Mr. Hatch. Lastly, Marie told the dispatcher that she was unable to get out of the room, as if they were trapped inside.

We find that there was sufficient evidence presented to prove that Mr. Hatch had either the specific intent to kill or inflict great bodily harm, or that he intentionally set the fire and it was foreseeable that human life was in danger. The trial court instructed the jury regarding the responsive verdict of negligent homicide, but the jury rejected that option. We find that the jury correctly found that Mr. Hatch's actions did not equate to negligent homicide. Accordingly, this argument lacks merit.

## MOTION FOR MISTRIAL

In his second counsel-filed assignment of error and his sole pro se assignment of error, Mr. Hatch contends that the trial court erred in denying his defense counsel's motions for mistrial due to the tainted jury venire.

Louisiana Code of Criminal Procedure Article 775 provides, in pertinent part, that "a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." "The 'prejudicial conduct' may include remarks

9

of veniremen during voir dire." *State v. Carmouche*, 01-405, p. 20 (La. 5/14/02), 872 So.2d 1020, 1035.

"[A] mistrial is a drastic remedy, and except in circumstances in which the mistrial is mandatory, is warranted only when a trial court error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial." *State v. Harris*, 00-3459, p. 9 (La. 2/26/02), 812 So.2d 612, 617. "A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion." *State v. Ortiz*, 96-1609, p. 10 (La. 10/21/97), 701 So.2d 922, 929, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998).

Defense counsel moved for a mistrial on two occasions, during voir dire and after jury selection. During voir dire, the trial court discovered that a prospective juror, Richard Estep, conducted independent research about the case on his cell phone and attempted to discuss his findings with others. The defense peremptorily struck Mr. Estep from the jury before the trial court learned of his improper behavior. After the trial court learned of Mr. Estep's behavior, the court asked the potential jurors if anyone had been approached by Mr. Estep. Three potential jurors came forward: Joseph Denison, Olivia Coco, and Dana Chavez. The trial court then individually questioned each prospective juror to determine what each juror overheard. Mr. Denison stated that when Mr. Estep started discussing the case, he "walked away" and did not listen to anything Mr. Estep had to say. Ms. Chavez stated when Mr. Estep started talking about the case, she "walked the other way"; however, she heard that the case had something to do with a "fire." Ms. Coco stated when Mr. Estep approached her about the case, she attempted to walk away, but Mr. Estep followed her. Ms. Coco recalled Mr. Estep stating something about a "suicide attempt" that involved a "child." After the trial court questioned the potential jurors, the following colloquy occurred:

**THE COURT:**

Mr. Huber, Mr. Robertson, [sic] your thoughts?

**MR. ROBINSON:**

Judge, I think that all three jurors indicated that they would still be impartial and that this would not affect them, so I don't think that any of the three should be removed for cause. The one who heard -- the only one well, it seems that Ms. Chavez and Ms. Coco both heard some facts listed in an article that Mr. Estep had read, but it seems they were both very clear that it didn't impact their decision about the case or wouldn't impact their verdict in looking at the cause or -- well, looking at off the top of my head rather, at the article in the Code of Criminal Procedure about a challenge for cause, it says that if a juror has already formed an opinion about the case, as long as they can set it aside and make their decision based on the evidence, then they're not to be struck for cause. And here, they have not formed an opinion about the case.

**THE COURT:**

Even if they had formed an opinion, that doesn't necessarily equate to exclusion.

**MR. ROBINSON:**

Yes, sir, that's what I'm trying to say. So here, they're far below even that, so we don't feel that they've reached a point of being excused.

**THE COURT:**

Mr. Alexander[,] your thoughts?

**MR. ALEXANDER:**

My thoughts are, I have two thoughts is that -- one, we don't know the extent of this yet. We've talked to the ones who have been identified to us, and I think it's going to be necessary to question all of them, not with particulars of anybody, but just to find out if there's anybody else who was aware of someone looking up from online, you know, reportage about this case so we can know the extent of it. We know some of it, that much that's been, you know, brought to the Courts [sic] attention so far; we don't know the other extent of it.

And the other thing I have to say is that I think I've heard enough already, that I would be considered remiss by the Louisiana Appellate Project attorneys if I did not move for mistrial. The Court has options on that. The Court has already talked about an admonition versus a grant of mistrial. I don't think I can fail to make that motion,

11

because I know that they would be saying "you should have done that."

**THE COURT:**

Sure.

**MR. ALEXANDER:**

Because there is a risk that the entirety of the jury pool has been tainted by this incident. And I wouldn't want to minimize the seriousness of the transgression of Mr. Estep if it continues to be confirmed by others. We've already heard enough to know and if I didn't make that motion, I think it would -- this a [sic] phrase we hear in sentencing a lot, "it would deprecate the seriousness of the offense."

**THE COURT:**

Understand, and I respect your acumen when it comes [to] that Mr. Alexander. And I agree I never question your belief that you should do something when you know you should. Your request for mistrial is denied at this time. I don't feel that the jury pool has been compromise[d] to the point to where it could jeopardize the integrity of the whole process here.

Obviously, if you feel that it merits additional discussion with the jurors that we seated in the box, and at any point to discuss it with others, that [sic] obviously I'd want you to pursue that, just be mindful of the fact that -- and no disrespect, but please, don't do anything that might further jeopardize the integrity of the trial. Again, no disrespect, King.

**MR. ALEXANDER:**

Oh, I understand, and absolutely I don't want to exacerbate the situation. As they say you know, "something that stinks, stinks more when you stir it."

**THE COURT:**

Good point, exactly. Well, with that being said, I'm going to call the jury back in and then we're going to swear in Ms. Ford. And we're going to have her do her information process and then I'm going to turn it over.

Again, I'll stress the admonition regarding looking up or doing any research regarding the trial that we have here and then I'm going to turn it over to the DAs office.

Thereafter, the trial court reiterated its admonition for conducting research about the case, stating:

**THE COURT:**

All right, ladies and gentlemen, thank you for your patience. Obviously, you've heard by now that there is commonly [sic] concern -- always concerned by the Court that information that comes to jurors is it [sic] always from the courtroom. We don't ask you to leave your common sense at the door, we don't ask you to leave your life experiences at the door, but what we do ask you to accept is that the process that we have here is a process that involves very important and life-changing matters.

The process has to be -- the integrity of the process has to be protected. If someone is going to be tried, the information that will be used to try them must come only from this courtroom, what [sic] hear and see in this courtroom. We realize that we live in a society now where information from many years ago is available at our hand. I don't even bring my phone to the courtroom because I don't want to be interrupted here, but we allow you to have your phones and communication devices because we've asked you to be away from your jobs, your families, your lifestyle.

But that information is not what we want you to access, we don't want that information to deprecate or jeopardize or interfere with your judgment. And, of course, we all know that if it's on social media, if it's on KPLC, if it's on [sic] the newspaper it's true. Because like my mama said, "if it's on the Internet, it's gotta [sic] be true, right?"

Well, if you have any sense at all, you'll know that not everything that you read is true. That's why it's so important that what happened here is based on information that you see in here, in this courtroom. I'm not asking you to close your eyes or shut yourself off from the world but just from this aspect of it, why you're here as a potential juror. I ask again, has anybody taken it upon themselves to research the situation or this particular case before they came here today or yesterday

(No response.)

**THE COURT:**

Thank you. Again, you're not in trouble but because I should have said something more yesterday, and if you did it [sic] what it does [sic] -- if you want to get out [sic] this jury, tell me you looked at it. But I mean, you know, I trust that you're here because you want to participate in this important process in our judicial system, but please, please, please, do not do any research on your own.

Again, this is a relatively short process in the grand scheme of things so, please, follow my directions. Thank you so much; I appreciate[ ] and I apologize for having this attitude[,] but you know, we've come a long way to get to this point here and I don't want to lose what we've accomplished to this point. Thank you. . . .

Eventually, all three potential jurors, Joseph Denison, Dana Chavez, and Olivia Coco, were excused from the jury. The defense peremptorily challenged Joseph Denison and Olivia Coco, and the State peremptorily challenged Dana Chavez.

Later, after the jury was sworn in, the trial court learned of another incident regarding a juror conducting independent research about the case. Subsequently, the following colloquy was had:

**THE BAILIFF:**

Number 38 is saying she can not be on this jury. She saw things online about it and she can't be on this jury.

**THE COURT:**

All right, Mr. Robinson, Mr. Alexander, you heard what the bailiff had to say. Is she still here?

**THE BAILIFF:**

Yeah, she's outside.

**MR. ROBINSON:**

Members of our team actually noticed that she did not raise her hand nor swear or affirm when they were being sworn in. Just for whatever it's worth, we noticed.

**MR. ALEXANDER:**

As Little orphan Annie used to say, what a revolting development. I don't know whether you want to talk to her further, but that was a pretty definitive statement and.

**MR. ROBINSON:**

Well, I definitely -- I would request that we speak with her and figure out what she.

**THE COURT:**

14

All right, Derek, get her in.

(Prospective Juror A[drienne] Clark Enters Courtroom.)

**THE COURT:**

Okay. Let the record reflect we have been joined by juror number 308 Ms. Adrienne Clark. Ms. Clark, did you take the oath?

**ADRIENNE CLARK:**

No, sir, I'm sorry. I didn't put my hand up. But like, I'm sorry, I'm just really nervous, and I'm scared.

**THE COURT:**

And why are you scared, Ms. Clark?

**ADRIENNE CLARK:**

Because I should have spoke[n] up, like this morning.

**THE COURT:**

And what should you have told us?

**ADRIENNE CLARK:**

**PROSPECTIVE JUROR:**

That I have seen some things online.

**THE COURT:**
Okay. How is it you came to see those things online?

**ADRIENNE CLARK:**

I seen them, looked.

**THE COURT:**

You looked it up?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

And you said online, social media, KPLC?

15

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

And you read the articles about the alleged offense?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

Okay. Well, you recognize, of course, that those are just media summations?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

And you heard my comment earlier today about, you know, if it's on the Internet it's gotta [sic] be true, of course.

**ADRIENNE CLARK:**

Right, which it's not.

**THE COURT:**

Which is ridiculous, of course.
**ADRIENNE CLARK:**

Right, yes, sir. I just want to be really honest.

**THE COURT:**

And I appreciate that and if there was ever a time to be honest, now is the time to be honest, please, be honest. So[,] it may well be that you know more information than some of the other jurors if they have not taken the opportunity to do that. Again, you recognize that those are allegations[,] and, in fact, truth be known in about 15 minutes after you get here in that seat tomorrow morning, you would hear those same things probably by the State, do you understand that?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

And of course, Mr. Alexander on behalf of the Defendant is gonna [sic] give you probably a different version of those alleged facts, do you understand that?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

And do you understand, as I indicated when we had the closing remarks before we left today, neither what Mr. Robinson would say or Mr. Alexander would say, tomorrow morning is evidence. The reason I go through all of that is that, what you may have read is not evidence either, do you understand that?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

All right, now that we've gone through all of that, again, I need brutal honesty here.

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

Do you think you still could be a member of this jury at this time[?]

**ADRIENNE CLARK:**

I could because I wouldn't base it on the media facts, what the media has said, I would just use my own opinion, yes, sir.

**THE COURT:**

Okay. And you recognize that you have to put that out of your mind?

**ADRIENNE CLARK:**

Yes, sir.

**THE COURT:**

17

Reality is, is probably some of the jurors knew something about it possibly already and they may have done some research if you will and some review. I mean we're all curious animals.

**ADRIENNE CLARK:**

Yeah, I mean, that's what I was thinking, there's probably more, but I'm a very honest person and I'm just -- I have to tell you.

**THE COURT:**

I understand. All that said, what are your thoughts about thinking you can still be on this jury?

**ADRIENNE CLARK:**

I can still do it, yes, sir.

**THE COURT:**

No, more investigations?

**ADRIENNE CLARK:**

No, sir.

Thereafter, the State and the defense questioned Ms. Clark regarding her research. Following their questioning of Ms. Clark, the State and the defense discussed their opinions on how the trial court should proceed, stating:

**THE COURT:**

Well --, Mr. Robinson, your thoughts now?

**MR. ROBINSON:**

Well, I thought it was pretty clear when the Court question[ed] her and when I questioned her, that she does not have an opinion that she cannot set aside. In fact, she doesn't have an opinion. And so[,] looking here at Code of Criminal Procedure Article 797, it doesn't look like there's a valid ground for challenge for cause.

As it relates to Mr. Alexander's comments, I'm not a hundred percent sure that she understood what those things meant, I don't think she was offended, surprisingly, I thought she was [going to] be by the way he was talking, but I don't think she was offended at all -- me watching her body language. And, Judge, when you stopped Mr. Alexander and asked him to ask a question, I think that remedied any

18

issue being caused by that back-and-forth, thankfully. I thought that was a great move[,] so I don't think we have any issues moving forward with her.

**THE COURT:**

Mr. Alexander?

**MR. ALEXANDER:**

I don't know if this has any legal effect, but I don't believe her when she says she's not prejudice[d] by what she saw. I do apologize for misconstruing where we were. I wouldn't have said, you know, something that sounded that kinda [sic] critical if I'd had realized we had missed the opportunity to have two alternates in the case. And I guess.

**THE COURT:**

We'll just because -- let me ask this question. We've had jurors before who said they knew something about a case, does that automatically disqualify someone from being able to serve as a juror?

**MR. ALEXANDER:**

Not every time, no, sir, it doesn't, not every time. It depends on what it is and how they're affected by.

**THE COURT:**

All right, do you feel that what she said amounts to enough information that would have disqualified her from being a juror?

**MR. ALEXANDER:**

I think her statement that I cannot be a juror in this case was pretty strong, and I wanted to know what that was about. And I assume that it meant that she could not be fair to both sides. And the one I'm assuming she cannot be fair to is gonna [sic] be my client, that's what I thought that meant.

**THE COURT:**

Well, I disagree. But I think what causes me some consternation here is obviously if she would have made the disclosure and you still had strikes, you would have struck her so. So[,] I'm gonna [sic] have to excuse Ms. Clark, and we'll inform Ms. Gann tomorrow morning that she's -- and we're going to proceed with one alternate. Unfortunate[,] but I'm afraid that's where we find ourselves. So, Derek, you can tell her that she's been excused and just to report back downstairs.

**MR. ALEXANDER:**

At this time, Your Honor, also and after consulting my cocounsel, I think I have to renew the motion for mistrial just, for the record.

**THE COURT:**

What for?

**MR. ALEXANDER:**

Because of the impropriety that occurred and the effect that it's had on our panel, and she said she's excuse[d] now and we're cut from one to two. I thought, you know, I had grounds before from the tainting from the voir dire and now this is something else, so it compounds the existing situation. So[,] I'm just renewing it and these additional grounds.

**THE COURT:**

Well, I've excused the juror.

**MR. ALEXANDER:**

Yes, sir, you have.

**THE COURT:**

Motion denied.

Afterwards, the trial court excused Ms. Clark and swore in the alternate, Ms. Trina Gann.

Mr. Hatch argues that the trial court erred by denying his motions for mistrial. According to Mr. Hatch, the trial court's admonitions to the jury venire were not enough and there was no way of knowing whether others were exposed to information regarding the case. Moreover, Mr. Hatch argues that the prejudicial conduct made it impossible for him to receive a fair trial.

The first circuit ruled on a similar issue in *State v. Eason*, 19-614 (La.App. 1 Cir. 12/27/19), 293 So.3d 61. In *Eason*, the trial court was informed that a juror

20

conducted independent research on the case. The trial court subsequently questioned each juror, and during questioning, juror Stogner revealed that he had read an article regarding the case in the local newspaper. The defense moved for a mistrial, arguing that "the defendant would be unable 'to receive a fair trial due to the actions of and failure to obey the instructions of the jury.'" *Id*. at 76. The trial court denied the motion but removed juror Stogner from the jury. On appeal, the defendant argued that the trial court erred in denying his motion for mistrial due to jury misconduct. In reviewing the defendant's argument, the first circuit noted:

> A criminal defendant has a Sixth Amendment right to a fair trial by a panel of impartial, indifferent jurors. Louisiana Code of Criminal Procedure article 797 protects a defendant's right to an impartial jury. See also La. Const. art. I, § 16. It is essential that all facts considered by the jury be presented in the courtroom with the full protection of the defendant's rights to confrontation and due process. A juror who considers evidence not developed or admitted at trial violates his sworn duty and may be guilty of misconduct. Therefore, if a reasonable possibility exists that extraneous information considered by the jury affected its verdict, a new trial is mandated. **State v. Hudson**, 2017-0154 (La. App. 1 Cir. 9/15/17), 2017 WL 4082424, at *6, <u>writ denied</u>, 2017-1735 (La. 6/1/18), 243 So.3d 1065.

*Id*. at 74.

The first circuit ultimately found the defendant's argument meritless, stating:

> There was no clear abuse of discretion in the denial of the motion for mistrial. Juror Stogner was removed from the jury, and while other jurors may have been exposed to the publicity in question, the defendant failed to establish that they were so impressed by it as to be incapable of rendering a fair and impartial verdict. There was also no clear abuse of discretion in the denial of the motion for new trial. The defendant failed to show that the denial of the motion for mistrial resulted in injustice to him.

*Id*. at 77.

Mr. Hatch has failed to show any prejudice that he suffered because of Mr. Estep's conduct. Mr. Denison, Ms. Chavez, and Ms. Coco were peremptorily struck. Additionally, as in *Eason*, the trial court removed Ms. Clark from the jury to prevent any unfairness to Mr. Hatch. Mr. Hatch failed to establish that he did

not receive a fair and impartial trial.  The trial court did clearly abuse its discretion when it denied the motions for mistrial.  Therefore, this assignment of error lacks merit.

IV.

**CONCLUSION**

For the foregoing reasons, the conviction of Defendant, Casey Michael Hatch, is affirmed.

**AFFIRMED.**